**R.V.K., Appellant/Cross–Appellee,**

v.

**L.L.K., Appellee/Cross–Appellant.**

**No. 04–01–00345–CV.**

Court of Appeals of Texas,
San Antonio.

Feb. 28, 2003.

Sam C. Bashara, Law Offices of Sam C. Bashara, P.C., San Antonio, for Appellant.

Richard R. Orsinger, John U. Hemmi, San Antonio, for Appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

OPINION ON RECONSIDERATION EN BANC

Opinion by: SARAH B. DUNCAN, Justice.

R.V.K. and L.L.K. appeal the trial court's property division in their divorce action. R.V.K. contends the trial court erred in refusing to limit the value of the couple's stock in the Medical Practice Group and the Medical Equipment Business in accordance with certain buy/sell agreements. L.L.K. also contends the trial court erred in valuing the couple's stock in the Medical Practice Group; however, she advocates a higher value than that found by the trial court. The court has reconsidered the case en banc and withdraws the panel opinions and judgment dated October 30, 2002. We agree with R.V.K. that the value of the couple's stock should be limited and we therefore reverse the trial court's judgment to the extent it divides the community property and remand this aspect of the cause to the trial court for further proceedings consistent with this opinion. In all other respects, we affirm the trial court's judgment.

THE TRIAL COURT'S SEALING ORDER

As a preliminary matter, we must explain our decision not to use the names

of the parties to this appeal or the names of the Medical Practice Group and the Medical Equipment Business.

After the panel's initial majority and dissenting opinions issued, the Medical Practice Group and the Medical Equipment Business filed a motion calling to our attention a sealing order they obtained in the trial court, which sealed the entirety of R.V.K.'s and L.L.K.'s experts' testimony and certain exhibits. This sealing order was completely ignored by the trial court's reporter and the parties' attorneys in filing the record and the parties' briefs and, until their recent motion, by the Medical Practice Group and Medical Equipment Business, which apparently made no effort to oversee or ensure court officials' or the parties' attorneys' compliance with the order. Nonetheless, the Medical Practice Group and the Medical Equipment Business asked that we (1) withdraw the initial opinions, (2) withdraw the order publishing the initial opinions, (3) withdraw the initial opinions from the court's website, (4) mark the court's file copies of the opinions in such a manner that will prevent their being "unwittingly provided to the public," (5) "remove from Westlaw, Lexis and all other publishing services and publishers the [initial majority and dissenting opinions]," and (6) revise the initial opinions "to omit any and all the information that is subject to and protected by the Order to Seal." We granted the motion in part.

With considerable effort by this Court and its staff, we (1) withdrew the initial majority and dissenting opinions, and substituted new opinions (2) removed the initial panel opinions from the court's website, Westlaw, Lexis, and VersusLaw (3) asked each of the more than thirty persons and entities to whom this court routinely e-mails copies of its published opinions to destroy their copies of the initial panel opinions, and (4) ordered the clerk to seal

(a) the portion of the record ordered sealed by the trial court but not filed under seal in this court (b) the parties' briefs, which were also not filed under seal and which are replete with references to and copies of the portions of the record ordered sealed by the trial court, and (c) the motions for rehearing and rehearing en banc and the response thereto, which were also not filed under seal.

But we have not ordered either the panel's initial or revised opinions and judgments or the opinions and judgment issued today sealed. Nor will we do so. "No court order or opinion issued in the adjudication of a case may be sealed." Tex.R. Civ. P. 76a; *see also* Tex. Gov't Code Ann. § 552.022(a)(12) (Vernon Supp.2002). Nor have we withdrawn the panel's order publishing the initial panel opinions; to do so would be ludicrous since the opinions have been withdrawn.

As made crystal clear by section 552.022(a)(12) of the Texas Government Code, as well as Texas Rules of Appellate Procedure 47.1 and 47.4, this Court is a court of record and thus has responsibilities not only to the litigants and the beneficiaries of the sealing order but also to the public. Presumably, therefore, the published opinions we issue should be cogent and meaningful not only to the litigants but also to members of the judiciary, the bar, and the public. And we simply cannot write cogent, meaningful opinions in this appeal without references to and excerpts from the sealed portion of the record; the sealed evidence goes to the very heart of the controversy posed by the parties and the disagreement between the majority and dissenting justices. Thus, to strip all references to or excerpts from the sealed portion of the record in our revised opinions would leave them devoid of meaningful substance. This result goes too far in the direction of abdicating our responsibili-

ties as a court of record. Rather than pursue this course of action, we have instead attempted to strike a fair balance between the Medical Practice Group's and the Medical Equipment Business's interest in keeping the sealed portion of the record confidential with the interest of this Court and the public in our fulfilling our responsibilities as a court of record. To achieve this balance our opinions retain references to and excerpts from the sealed portion of the record, while attempting to conceal the identities of the parties, the Medical Practice Group, and the Medical Equipment Business.

In short, with considerable effort by the Court and its staff and at taxpayer expense, we have attempted to "undo" our initial opinions in this appeal and issue today's en banc opinions that shield from public view the private interests protected by the trial court's sealing order without compromising the public nature of our responsibilities as a court of record.

### FACTUAL AND PROCEDURAL BACKGROUND

R.V.K. is a medical doctor who, since May 1997, has been a member of and stockholder in the Medical Practice Group. R.V.K. also owns stock, either directly or indirectly, in other partnerships and corporations that we will collectively refer to as the Medical Equipment Business. The Medical Equipment Business operates and owns an undivided one-half interest in the facilities and related equipment used by members of the Medical Practice Group. Stock ownership in the Medical Practice Group and the Medical Equipment Business is subject to buy/sell agreements, which are signed by the member physicians and their spouses.

The Medical Practice Group's buy/sell agreement provides that if an "operative event" occurs, either the Medical Practice Group or its remaining stockholders must buy the selling stockholder's stock at one of two prices: (1) if a new stockholder purchased stock in the previous fifteen months, the purchaser must pay the price paid by the new stockholder; or (2) absent such a sale, the purchaser must pay the book value of the Medical Practice Group's assets (other than the accounts receivable and commercial goodwill) less outstanding liabilities. The Medical Practice Group's buy/sell agreement also provides that if a stockholder desires to sell her stock to a third party, the stockholder first must tender the stock to the Medical Practice Group, which then has sixty days to purchase the stock at the price offered by the third party. If the Medical Practice Group does not purchase the stock, it must notify the existing stockholders, who then have an additional sixty days to purchase the stock at the price offered by the third party. Only if neither the Medical Practice Group nor the other stockholders purchases the stock may the stockholder sell her stock to the third party.

The Medical Equipment Business's buy/sell agreement requires a stockholder to sell his stock to the corporation or to the other stockholders for an amount equal to the stockholder's initial investment upon the occurrence of an "operative event." Under both buy/sell agreements, "operative event" is defined to include the attempted sale, transfer, gift, mortgage, or pledge of stock without the corporation's consent; termination of a stockholder's employment; and termination of a shareholder's marriage by death or divorce if the stockholder does not succeed to his or her spouse's community interest in the stock.

At trial, the business manager for both the Medical Practice Group and the Medical Equipment Business, R.J.R., testified on R.V.K.'s behalf. Because there had been sales of stock within the previous

fifteen months, R.J.R. based his valuations on the formulas set forth in the buy/sell agreements. He testified that the value of the stock in the Medical Practice Group was $25,000; and the value of the stock in the Medical Equipment Business is equal to R.V.K.'s initial investment of $50,000. R.J.R. also testified that R.V.K. was entitled to $256,000 in deferred compensation. Because the amount and divisibility of R.V.K.'s deferred compensation is undisputed, the remainder of this opinion will focus on the value of the stock only.

L.L.K.'s expert, CPA D.H., testified that the "fair market value" of the parties' stock in the Medical Practice Group was $663,000; and the "fair market value" of the stock in the Medical Equipment Business was $92,484. However, D.H.'s work papers demonstrate that he in fact calculated the value of the couple's interest in the "[e]nterprise value" of the Medical Practice Group. *See, e.g., Swope v. Siegel–Robert, Inc.*, 74 F.Supp.2d 876, 911 (E.D.Mo.1999) ("Enterprise value has been defined as the amount 'a willing buyer realistically would pay for the enterprise as a whole on the statutory valuation date.'"), *affirmed in part and reversed in part on other grounds*, 243 F.3d 486 (8th Cir.), *cert denied*, 534 U.S. 887, 122 S.Ct. 198, 151 L.Ed.2d 139 (2001); *Jeffries v. Mills*, 165 Or.App. 103, 995 P.2d 1180, 1190 (2000) (defining "enterprise value" as "earnings or investment value"). The work papers thus begin with the Medical Practice Group's financial statement, continue with its earnings statement, and conclude with the couple's interest in the enterprise value of the Medical Practice Group. Similarly, the starting point for D.H.'s valuation of the Medical Equipment Business stock was a "business valuation" performed in anticipation of a comprehensive reorganization and consolidation of the facilities owned by the Medical Practice Group with the imaging centers owned by a third party. D.H. testified he did not apply a minority discount to reflect R.V.K.'s minority interest in the corporations, although he admitted he had applied a twenty to thirty percent minority discount in a previous, similar case; and he applied at best "a minor marketability discount" of three-one-hundredths of one percent to reflect the restricted marketability of the Medical Practice Group stock even though a marketability discount of more than ten percent is more normal.[1]

In a conversation with the trial judge, the parties framed the issue as whether the "commercial goodwill" attributable to the Medical Practice Group and the Medical Equipment Business was a community asset and divisible upon divorce. Arguing that the commercial goodwill was not subject to division, R.V.K. relied upon *Finn v. Finn*, 658 S.W.2d 735 (Tex.App.-Dallas

---

1. The dissent states that "D.H. testified that he applied an 8.3% marketability discount to arrive at fair market value." This is incorrect.

   D.H.'s written report reflects that he credited R.V.K. with only 91.7% of the value of his percentage ownership in the Medical Practice Group, because R.V.K. was "[v]ested @ 55 out of 60 months." Of course, 55 divided by 60 is .916666, which of course might be rounded to .917 or 91.7%. However, the report does not indicate whether D.H. arrived at his 91.7% by rounding or by including a .03% marketability discount. On direct examination, D.H. testified that he reduced the value of the couple's ownership in the Medical Practice Group by a little over eight percent "and that's a variety of factors. There would be some expensive marketability if you needed to market this, and he hadn't fulfilled all of his time under the employment [agreement]." On cross-examination, D.H. admitted the 8.3 percent discount reflected in his report included only "a minor marketability discount" and that "normally, you have higher marketability discounts than 10 percent." Thus, at best, D.H. applied a .03% marketability discount.

1983, writ ref'd n.r.e.) (en banc), in which the court held that a law firm's commercial goodwill was not divisible upon divorce, because "[t]he [partnership] agreement does not provide any compensation for accrued goodwill to a partner who ceases to practice law with the firm, nor does it provide any mechanism to realize the value of the firm's goodwill." *Id.* at 742. L.L.K. argued that the commercial goodwill was divisible in reliance upon *Keith v. Keith,* 763 S.W.2d 950 (Tex.App.-Fort Worth 1989, no writ), in which the court held that "the formula set forth in the partnership agreement with respect to death or withdrawal of the partner is not necessarily determinative of the value of a spouse's interest in the ongoing partnership as of the time of divorce." *Id.* at 953. Given this choice, the trial judge decided to follow *Keith,* concluding that the Medical Practice Group's and Medical Equipment Business's buy/sell agreements do not limit the stock's value. She therefore based her 50/50 division of the value of the couple's stock in the Medical Practice Group and the Medical Equipment Business upon D.H.'s "fair market value."

## STANDARD OF REVIEW

■ We review the trial court's division of the community estate under an abuse of discretion standard. *Murff v. Murff,* 615 S.W.2d 696, 700 (Tex.1981). Because "[a] trial court has no 'discretion' in determining what the law is or applying the law to the facts," "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

## "COMMERCIAL GOODWILL"

On appeal, R.V.K.'s first issue asks "whether the trial court erred in concluding the buy-sell agreements did not limit

the value of [the Medical Practice Group's and the Medical Equipment Business's stock] for purposes of valuation in a divorce action." His argument, however, focuses upon *Finn* and *Keith* and whether a buy/sell agreement controls the valuation of stock. In response, L.L.K. argues we should follow *Keith* and hold that the buy/sell agreements do not limit the value of the stock for purposes of divorce. D.H., too, states in his November 3, 2000 letter to L.L.K.'s attorney:

> In determining the fair market value of an ownership in a professional practice, one must consider corporate or group goodwill as contrasted to individual goodwill and must further determine what portion of owner compensation is being received for services rendered and what portion is in reality entity profits which are distributed as compensation because of the operations of the tax law. We have taken these factors into consideration. . . .

But this is the only mention of "goodwill" in D.H.'s reports and accompanying worksheets. In fact, as discussed more fully below, the distinction between D.H.'s and R.J.R.'s valuations is not "commercial goodwill" but their underlying assumption regarding marketability of the stock. D.H. assumed stock without a significant marketability restriction, while R.J.R. assumed stock whose marketability is significantly restricted by the buy/sell agreements. Because commercial goodwill is not the basis for R.J.R.'s and D.H.'s differing valuations of the stock, we deem it unnecessary to accept the parties' invitation to choose between *Finn* and *Keith.* We instead turn to the substance of R.V.K.'s broadly-framed issue—"whether the trial court erred in concluding the buy/sell agreements did not limit the value of [the Medical Practice Group's and the Medical Equipment Business's stock] for purposes of valuation in a divorce action."

### Valuation of Stock Subject to a Buy/Sell Agreement

■ As a general rule, the value to be accorded community property that is to be divided in a divorce proceeding is "market value." *See Walston v. Walston,* 971 S.W.2d 687, 690 (Tex.App.-Waco 1998, pet. denied); *see also Beavers v. Beavers,* 675 S.W.2d 296, 299 (Tex.App.-Dallas 1984, no writ). "Fair market value has been consistently defined as the amount that a willing buyer, who desires to buy, but is under no obligation to buy would pay to a willing seller, who desires to sell, but is under no obligation to sell." *Wendlandt v. Wendlandt,* 596 S.W.2d 323, 325 (Tex.Civ.App.-Houston [1st Dist.] 1980, no writ); *see City of Pearland v. Alexander,* 483 S.W.2d 244, 247 (Tex.1972). If the property does not have a market value, the parties may show the actual value of the property to the owner. *Beavers,* 675 S.W.2d at 299 (holding that because a buy/sell agreement required the stockholder to first tender his stock to the other stockholders at book value, book value was an appropriate method to value stock).

■ Contrary to R.V.K.'s argument, the divorce proceeding has not triggered the buy/sell agreements. There has not been an "operative event"—an attempted sale, transfer, gift, mortgage, or pledge of stock without the corporations' consent; termination of R.V.K.'s employment; or termination of his marriage by death or divorce in a manner that dictates that R.V.K. will not succeed to L.L.K.'s community interest in the Medical Practice Group and the Medical Equipment Business stock. But it is equally clear that D.H.'s analysis does not reflect either market or actual value of the stock. As D.H. admitted at trial, the couple could never receive for the Medical Practice Group stock the amount he claimed to be its "market value":

Q. And R.V.K. is never, ever, ever going to get that [$663,000] for the sale of his [Medical Practice Group] stock, is he?

A. No. He's going to get an income stream until he leaves the organization which includes a huge profit element over and above salary which is very substantial which would indicate that the fair value of such an interest is, in fact, worth more than what is in the agreement.

Q. Can he get a single penny of that money if he doesn't work for them? Let's say he stops working. Does he get anything?

A. No. If he stops working—he leaves, he gets what's in the buy/sell agreement.

Q. And so the bottom line on this—The only way he can get the money, the substantial benefit that you're talking about, is to continue to work. You just think that he's getting paid more than his services were actually worth if he was in the open market?

A. Uh-huh. He has to continue to work in order to realize the value.

D.H.'s testimony, like his work sheet for the Medical Practice Group, demonstrates the flaw in his reasoning.

■ With respect to the Medical Practice Group, D.H. valued the assets, liabilities, and income stream of the corporation as a whole—its "enterprise value," "the highest level at which a company's worth may be assessed." *Swope,* 74 F.Supp.2d at 911. But "enterprise value by its nature does not include a discount based on shares' minority status or lack of marketability ..." *Id.* Enterprise value may thus be an appropriate means of valuing the stock of an ongoing business to determine its "fair value" in the context of a stockholder who dissents to a merger or acquisition since "the purchase contemplat-

ed gives the buyer total control over the corporation...." *Id.* Similarly appropriate was the use of enterprise value in anticipation of merging the imaging centers to form the Medical Equipment Business. But "enterprise value" is entirely inappropriate in the context of valuing a minority position in stock subject to a buy/sell agreement for purposes of divorce. *See Beavers*, 675 S.W.2d at 299. Because the business is not being sold as a going concern, the buy/sell agreement, whether triggered by an "operative event" or not, will dictate both the significantly limited marketability of the stock and the importance of the minority position. *See id.*

Indeed, the record in this appeal does not contain even a scintilla of evidence that the market or actual value of the Medical Practice Group and Medical Equipment Business stock even approximates D.H.'s "fair market value" valuations. To the contrary, this record establishes that the "fair market value" of the stock in all likelihood does not exceed the values placed on the stock by the buy/sell agreements—$25,000 for the Medical Practice Group stock and $50,000 for the Medical Equipment Business stock. In short, D.H.'s "fair market value" represents the fair market value of R.V.K.'s ownership in ongoing businesses—including the value of his future compensation arising out of his employment—not the fair market value of the couple's stock on the date of divorce, the only asset subject to valuation.

### CONCLUSION

Because the trial court erred in failing to consider the buy/sell agreements' significant restriction on the marketability of the stock, it failed to derive the stock's market value. We therefore reverse that part of the trial court's judgment dividing the community property and remand this aspect of the cause to the trial court for further proceedings consistent with this opinion. *See Jacobs v. Jacobs*, 687 S.W.2d 731, 732 (Tex.1985) ("court of appeals must remand the entire community estate for a new division when it finds reversible error which materially affects the trial court's "just and right" division of the property."). In all other respects, we affirm the trial court's judgment.[2]

Concurring and Dissenting opinion by: ALMA L. LÓPEZ, Chief Justice.

I concur in the majority's conclusion that the trial court erred in failing to properly derive a fair market value for R.V.K.'s ownership interest, but I agree with the dissent that we should address whether *Finn* or *Keith* should be followed in determining whether goodwill should be included in valuing a professional practice. I also agree with the dissent that we should follow the holding in *Keith* and the reasoning in Justice Stewart's concurring opinion in *Finn*. However, resolving that issue does not resolve all of the issues raised in this appeal, including the cross-appellant's express challenge to the trial court's valuation of R.V.K's interest in the Medical Practice Group.[1]

---

2. In light of our disposition of R.V.K.'s appeal, it is unnecessary to address L.L.K.'s cross-appeal. L.L.K. first asks that we "remand to the Trial Court with instructions to redivide the community estate using the value of $663,000 [for the Medical Practice Group stock]"; we have, in effect, rejected this requested relief in resolving R.V.K.'s appeal, just as we have, in effect, granted L.L.K.'s requested alternative relief "to remand for a

redetermination of the value of [the Medical Practice Group], and a new property division."

1. In her issue on cross-appeal, L.L.K. states:

In Finding of Fact No. A1, the Court set out the values it found for all community property assets. [CR193] This was done by reference to an Exhibit A, attached to the

The dissent relies on D.H.'s testimony as evidence to support the trial court's valuation determination and explains the difference between the value D.H. provided and the value the trial court assigned by permitting the trial court to apply a minority discount. In discussing the minority discount, the dissent states, "[D]uring cross-examination, D.H. admitted that he had recommended a twenty-five to thirty percent minority discount in a similar medical practice valuation case where the doctor owned an eight percent interest in the medical practice. As a result, the trial court properly applied a thirty percent minority discount and determined that the value of R.V.K.'s stock in the Medical Practice Group was $464,000, rather than $663,000."

D.H.'s testimony does not support the dissent's reasoning that the other medical practice valuation was "similar" to the instant case. D.H. testified that the cases were not similar, and based on D.H.'s testimony, the minority discount percent to be applied in any given case is entity-specific.[2] Therefore, the trial court could

> Findings. Item 9.4 on Exhibit A reflects that the Trial Court found the value of the parties' interest in [the Medical Practice Group] to be $464,000. [L.L.K.] challenges the legal and factual sufficiency of the evidence to support this finding, and argues instead that the evidence conclusively showed, or the great weight and preponderance of the evidence established, that the value of the parties' interest in [the Medical Practice Group] was $663,000, as indicated by expert witness [D.H.], the only expert to testify to fair market value.
>
> Contrary to the dissent's assertion, I believe the sufficiency of the evidence to support the trial court's valuation finding was raised by L.L.K., and R.V.K. cannot preclude this court from considering L.L.K.'s challenge to the sufficiency of the evidence by arguing in support of the trial court's finding in his reply brief.

2. The following excerpts from the trial testimony refute the dissent's contention that the other medical practice valuation case was similar to the instant case:

Q. I don't see on here anywhere where you used a minority discount. Did you in this case apply a minority discount?

A. No. I did not.

Q. Isn't it true, sir, that when you have a minority position such as [R.V.K.] it is customary and usual to apply a minority discount?

A. If, in fact, they're a majority—just—If they're a majority of people. In this particular case, there are 21 owners. No one controls the unit so you don't have the same circumstances you normally have when you—and in a normal circumstance where there is a controlling—In the theory of business valuation, the minority interest discount is the inverse of the controlled premium. There is no controlled premium when you have 21 owners.

Q. I'm not asking you about controlled premium; I'm asking you about minority discount. And what I'm saying is, if you've got a 4 percent interest, isn't is usual and customary to apply a minority discount?

A. Depending on the circumstances, more often than not, you would have one. In this particular instance, we did not. We had 20 owners; all of them have the same ownership in this entity. No one controls the entity.

\* \* \* \* \* \* \* \* \* \* \* \* \*

Q. Let me just make sure that I've got this right. In a situation where you have a minority position such as [R.V.K.], isn't it true it's customary and usual to apply a minority discount of between 5 and 35 percent to come to the value of his shares?

A. It is customary to evaluate the necessity of a minority discount, Mr. Bashara.

Q. I'm not asking—

A. I'm not telling you that it is at all times customary that it be from this range to that range or that it even exists. [omitting objections and discussion] ... I think in many instances a minority discount—something 20 to 40 percent—I might have even testified at some time, 25 to 35 percent—in many times [is] an appropriate discount. Sometimes there is no discount. Other times it's very large. I recently had a case where it was 70 percent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Q. And, sir, I want you to give me any sapient facts that you can recall that distin-

not properly apply a minority discount calculated for another entity in reaching a fair market value for the interest in the entity in question.

I do not believe it was appropriate for the trial judge to select a thirty percent minority discount absent expert testimony that a minority discount should apply and what the minority discount should be for the particular entity. Much commentary has been written questioning the application of a minority discount in business appraisals. *See generally* John C. Coates, IV, *"Free Value" as an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. PA. L.REV. 1251, 1280, 1349 (1999) (noting minority discounts are difficult to observe directly and determining the existence of such a discount requires estimating the synergy value, pure control value, or expropriation value and concluding that Delaware should continue to reject minority discounts); Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 DUKE L.J. 613, 641–54 (1998) (noting that a majority of courts reject any attempt to apply a minority discount). Therefore, I concur in the majority's conclusion that the trial court failed to derive the stock's fair market value and agree that the cause should be remanded to the trial court for further proceedings.

Dissenting opinion by: SANDEE BRYAN MARION, Justice, joined by CATHERINE STONE, Justice.

I respectfully dissent and I would affirm the trial court's judgment.[1] I believe this court should answer the question presented at trial and on appeal: should the *Finn* decision or the *Keith* decision be followed when determining the value of a professional practice upon divorce? I agree with Annette Stewart's concurring opinion in *Finn* and the court in *Keith,* and would hold that the value of R.V.K.'s interest should be based on the present value of the entities as ongoing businesses, which would include such factors as limitations associated with the buy/sell agreements and consideration of commercial goodwill.

Here, it was undisputed at trial that the Medical Practice Group and the Medical Equipment Business have commercial goodwill. The Medical Practice Group and the Medical Equipment Business are part of a complex group of interrelated entities that work together to provide radiology services in nineteen different locations in the Bexar County area. The Medical

---

guishes Dr. Moore's situation from an evaluation standpoint from [R.V.K.'s] other than the side of the case that you were on. [Omitting objections and discussion]

A. I valued HAVIT for purposes of a shareholder agreement. I didn't value Dr. Moore as a separate matter.... I think Mr. Bashara, there is a huge difference between a shareholder group that numbers 21 people and a shareholder group that was, in my memory, 8 to 9 maybe 10 people. They had a bunch of entries and exits during that period of time.

And, you know, if it's—I think we read in there it was 8.33 percent, which would indicate that there were 12 people in the group. The value of the entity was in the nonvoting stock. They had two classes of stock. They all had equal vote, but they did not have equal value in the company. And in that particular—And so that is a distinction between what you have with the radiology group and what you had at HAVIT. It isn't—Is it routine to do minority discounts? Most of the time. But what the minority interest discount is, is the inverse of the control premium. And that is consistent with all of the literature on business valuation.

And if there's no control premium, you don't have to apply it. And there is no control premium in this case.

1. I do concur with the majority regarding the sealing order.

Practice Group employs thirty-nine physicians, with some, but not all being shareholders, and fifty-five non-physicians. The Medical Equipment Business owns an interest in a partnership, which in turn, owns approximately fifty percent in a limited partnership along with the Methodist Health Care System. The Medical Equipment Business holds and manages all the equipment, the facilities, lease agreements, and the technical services agreements for the Medical Practice Group. These businesses clearly have value separate and apart from the individual physician's personal skills, ability, and reputation.

I agree with the majority's statements that no triggering events occurred here, and that the asset subject to valuation is the parties' stock in the businesses. However, I disagree with the majority's and concurrence's analysis of the evidence. The only issue on appeal is whether the formula in the buy/sell agreements controlled valuation of the parties' interest in the Medical Practice Group and the Medical Equipment Business. R.V.K. has not challenged the legal or factual sufficiency of the evidence, and in fact, states in his reply brief, "Accordingly, the evidence is both legally and factually sufficient to establish a fair market value, absent the buy-sell agreement, in the amount of $464,000." Because the sufficiency of the evidence has not been raised on appeal, I believe this court should not address whether the evidence was sufficient to support the trial court's valuations.

Nor do I agree with the majority's and concurrence's finding fault with D.H.'s valuations. On appeal, R.V.K. did not challenge D.H.'s methodology except to argue that he did not rely on the limitations imposed by the buy/sell agreements. Nevertheless, because the majority and concurrence reach this issue, I write separately as well.

D.H., who is accredited in business valuation for the American Institute of CPAs, has valued numerous doctors' practices, as well as other professional practices. In his formal written report, D.H. stated that the "focus of our evaluation was the determination of the fair market value of [R.V.K.'s] ownership in the various entities." In reaching his determination, D.H. stated as follows:

It is our understanding that in both the literature of business valuations and in case law, values computed in accordance with a buy-sell agreement may or may not represent the fair market value of an ownership in an entity. While values computed under a buy-sell agreement may have some instructive value, such computations are determinative only if the terms and conditions of the buy-sell agreement are being implemented with respect to the value. It is our understanding that [R.V.K.] is not selling his interest in these entities, and the buy-sell agreements are not being invoked since he is not parting with his interest. Accordingly, *we have taken the computations under the buy-sell agreements as pieces of information to be evaluated with all of the other evidence in arriving at our opinion of the fair market value of the interest of [R.V.K.] in each of these entities.* (Emphasis added.)

Further, D.H. testified that he applied an 8.3 percent marketability discount to arrive at fair market value. He stated, "I used an 8.3 percent discount which included a minor marketability discount and the fact that he hadn't fulfilled all his retirement." When R.V.K.'s counsel said he did not see anything in D.H.'s report that suggested a marketability discount, D.H. stated, "[The] [m]arketability discount in this case would be relatively small.... Some-

where in the range of 5 or 10 percent.... It's 8.3 percent, Mr. Bashara."

A marketability discount is one that is applied for the time value and difficulty of finding a market. If a property interest is particularly attractive and there is an active market of people who would be interested in it, then the discount decreases. D.H. concluded that the fair market value of R.V.K.'s interest in the Medical Practice Group was $663,000, and the value of his interest in the Medical Equipment Business was $92,484. Thus, D.H. calculated the fair market value of the stock based on the value of the businesses as ongoing entities, taking into account the limitations imposed on the stock by the shareholder agreements and the lack of a market for the stock. I believe this was proper. Furthermore, D.H.'s testimony was the only evidence of fair market value. R.J.R. did not testify about fair market value; instead, he based his valuation on the amount that would be payable under the buy/sell agreements.

D.H. did not apply a minority discount to his valuation of the Medical Practice Group stock. A minority interest discount is one that is applied when the seller is a minority shareholder and has no controlling interest in the company. However, during cross-examination, D.H. admitted that he had recommended a twenty-five to thirty percent minority discount in a similar medical practice valuation case where the doctor owned an eight percent interest in the medical practice. As a result, the trial court properly applied a thirty percent minority discount and determined that the value of R.V.K.'s stock in the Medical Practice Group was $464,000, rather than $663,000.00.

In one of his worksheets, D.H. calculated the value of the entire Medical Practice Group and stated "Enterprise value $16,481,077." He did not define the term "enterprise value," but he used it during his testimony to refer to the value of the Medical Practice Group as a whole. D.H. then calculated the value of the parties' interest in the business. In my opinion, in order to determine the parties' interest, D.H. properly determined the value of the entire business first.

While I agree with R.V.K. that a spouse who signs a contract should be bound by it absent a showing of fraudulent inducement, none of the triggering events specified in the agreements have occurred here. Unless a triggering event occurs, I believe a trial court should not be limited to the formula in the agreement when determining the value of an individual's share upon divorce. I would conclude that the value of the parties' interest should be based on the present value of each entity as a going business, taking into consideration the limitations imposed by the shareholder agreements and the commercial goodwill. In my opinion, that is what the trial court did in this case.

For these reasons, I would affirm the trial court's judgment in all respects.