**Motion for Rehearing Denied; Opinion of October 31, 2013 Withdrawn; Affirmed and Substitute Opinion filed January 16, 2014.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00555-CV

## MICHAEL DODD AND 3D GLOBAL SOLUTIONS, INC., Appellants

## V.

## BRIAN J. SAVINO, Appellee

**On Appeal from the 127th District Court
Harris County, Texas
Trial Court Cause No. 2011-70013**

## SUBSTITUTE OPINION

We issued an opinion in this case on October 31, 2013, affirming the trial court's judgment. Appellants subsequently filed a motion for rehearing. Without changing our previous disposition, we deny the motion for rehearing, withdraw our earlier opinion, and issue this substitute opinion in its place.

This is an appeal from a no-answer default judgment granted in favor of Brian J. Savino. Appellants Michael Dodd and 3D Global Solutions, Inc. present

the following four questions for review: (1) whether Dodd may be held individually liable under an alter ego theory of liability; (2) whether the trial court abused its discretion by denying their *Craddock* motion for new trial; (3) whether the trial court erred by denying their special appearance; and (4) whether the evidence is legally sufficient to support the award of damages and attorney's fees. We affirm the trial court's judgment.

## BACKGROUND[1]

The controversy in this case stems from a failed investment transaction. In June 2011, Michael Dodd, a California resident, mailed a stock offering to two prospective investors: Brian Savino, a Houston native; and Augusta Energy Partners, a Swiss company. The offer solicited a $10 million investment in 3D Global Solutions, Inc., a Delaware corporation where Dodd served as president and CEO. At the time of Dodd's letter, 3D Global was actively trying to expand into the fuel distribution business. Dodd envisioned that Savino, an experienced oil trader, would facilitate the corporation's expansion efforts.

Savino considered the offer. Between July and September 2011, Dodd engaged in regular telephone and email communications with Savino in Texas. The parties discussed the building of a business relationship, which contemplated that Savino and Augusta would become equity investors in 3D Global, and that Savino would work for 3D Global as an oil trader in Houston. Dodd requested that Savino and Augusta each provide $150,000 in earnest money, which would be refundable in ten days if their transaction failed to close. Dodd also requested that Savino and Augusta approve the use of $1.2 million of their investment proceeds to make

---

[1] Appellants contest some of the background facts. We base this background section on the findings of fact issued by the trial court, discussed *infra*.

2

personal payments to Dodd. Savino agreed to the proposals and wire transferred the earnest money payment to Dodd's bank account in Indiana.

After receiving the earnest money payment, Dodd traveled to Houston to meet with Savino and continue their business negotiations. The parties went to the Houston offices of Ernst & Young, where Savino personally engaged the accounting firm to perform due diligence on the proposed transaction. Dodd agreed to reimburse Savino one-third of Ernst & Young's fee, with Savino and Augusta bearing the remaining share. In another meeting, Dodd also agreed to reimburse certain expenses that Savino incurred when he traveled to 3D Global's offices in New York and New Jersey.

Ernst & Young performed an accounting of 3D Global and found that its net present value did not correspond with the representations made by Dodd. Savino further learned during the course of due diligence that Dodd had commingled his personal funds with 3D Global's and that the corporation was not adequately capitalized. Based on these findings, Savino and Augusta decided not to close on the investment. Savino requested, pursuant to the terms of his agreement with Dodd, that his earnest money be returned. Dodd made repeated assurances to Savino that his reimbursement was forthcoming. Despite his representations, Dodd never returned the money.

On November 17, 2011, Savino filed an original petition in Texas alleging causes of action for breach of contract, quantum meruit, and money had and received. Savino claimed that appellants had failed to return his earnest money within ten days of their failed investment transaction. Savino also alleged that appellants had failed to reimburse him for the one-third share of the Ernst & Young fee and for other travel expenses that they had promised to pay. Savino effectuated service on the Texas Secretary of State, who forwarded the petition and

3

citation to 3D Global's registered agent in Delaware. Appellants' answer was due to be filed no later than December 27, 2011, but no answer was timely received.[2]

Savino filed a motion for default judgment on January 4, 2012, and an amended motion on February 6, 2012. After each filing, a copy of the motion and a notice of hearing were served on both Dodd and 3D Global. Again, appellants filed no responsive pleading. After the trial court granted Savino a default judgment, appellants filed a motion for new trial and special appearance. In denying appellants' special appearance, the trial court signed written findings of fact and conclusions of law, determining that specific jurisdiction was proper over both Dodd and 3D Global. The court overruled appellants' motion for new trial by operation of law.

## SPECIAL APPEARANCE

We begin with appellants' third issue, which disputes the trial court's exercise of personal jurisdiction.

### A.      Governing Law

A court must have personal jurisdiction over a defendant before it can issue a binding judgment against him. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996). If the defendant is a nonresident, a Texas court may exercise jurisdiction over him if the exercise is authorized by the Texas long-arm statute. *See* Tex. Civ. Prac. & Rem. Code § 17.042. The supreme court has interpreted the broad language of the Texas long-arm statute to extend Texas courts' exercise of personal jurisdiction "as far as the federal constitutional requirements of due

---

[2] The Secretary of State was served with process as agent for 3D Global on November 28, 2011. The Secretary was separately served with process as agent for Dodd on November 30. 3D Global's answer was due on Monday, December 19, whereas Dodd's was due on Tuesday, December 27. For the sake of clarity and ease, we refer to appellants' answer date as December 27.

process will permit." *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Those requirements are fulfilled if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts are sufficient to support the exercise of personal jurisdiction if they show that the nonresident defendant has purposefully availed himself of the privilege of conducting activities within the forum statute, thus invoking the benefits and protections of its laws. *See id.* at 319; *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). In determining whether the purposeful-availment requirement is satisfied, courts consider only the defendant's contacts with the forum state, and not the unilateral activity of a third party. *Michiana*, 168 S.W.3d at 785. The defendant's contacts with the forum state must be purposeful rather than merely fortuitous. *Id.* Additionally, the defendant must seek some benefit, advantage, or profit by availing himself of the forum. *Id.*

Personal jurisdiction may be either general or specific. *Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010). A trial court may exercise general jurisdiction over a defendant whose contacts with the forum state have been continuous and systematic. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007); *BMC Software*, 83 S.W.3d at 796. When general jurisdiction is at issue, only the defendant's pre-suit contacts are relevant. *PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 169 (Tex. 2007). On the other hand, when there is a substantial connection between the defendant's purposeful contacts with Texas and the operative facts of the litigation, a trial court may properly exercise specific jurisdiction over the defendant. *Moki Mac*, 221 S.W.3d at 585.

A defendant challenging a Texas court's personal jurisdiction must negate every jurisdictional basis that is alleged. *BMC Software*, 83 S.W.3d at 793; *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex. 1995). Thus, the plaintiff has the initial burden of pleading sufficient facts to bring the nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software*, 83 S.W.3d at 793; *Brocail v. Anderson*, 132 S.W.3d 552, 556 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). If the plaintiff fails to do so, then proof of the defendant's non-residency is sufficient to negate personal jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010). If the plaintiff does allege sufficient jurisdictional facts, then the defendant can defeat jurisdiction in several ways. The defendant can introduce evidence contradicting the plaintiff's factual allegations, or show that the defendant's contacts with the forum state fall short of purposeful availment, or demonstrate that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction. *Id.* at 659. If specific jurisdiction is at issue, as here, then the defendant may also show that the plaintiff's claims do not arise from the defendant's contacts with Texas. *Id.*

## B.     Standard of Review

Whether a trial court has personal jurisdiction over a defendant is a question of law we review de novo. *Moki Mac*, 221 S.W.3d at 574; *BMC Software*, 83 S.W.3d at 794. When, as here, the trial court issues findings of fact and conclusions of law in connection with its ruling on the special appearance, the defendant may challenge the trial court's factual findings for legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 794. On appeal, the scope of review includes all evidence in the record. *Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 99 (Tex. App.—Houston [14th Dist.] 1995, writ denied).

We review any challenged findings by applying the same standards used in reviewing jury findings. *Wiese v. Pro Am Servs., Inc.*, 317 S.W.3d 857, 860 (Tex. App.—Houston [14th Dist.] 2010, no pet.). When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* We will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) we are barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. In reviewing the factual sufficiency, we consider all of the evidence and will set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Meehl v. Wise*, 285 S.W.3d 561, 565 (Tex. App.—Houston [14th Dist.] 2009, no pet.). We review the trial court's legal conclusions de novo. *Greenfield Energy, Inc. v. Duprey*, 252 S.W.3d 721, 730 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

## C. Analysis

Appellants do not dispute that their actions were covered by the Texas long-arm statute. *See* Tex. Civ. Prac. & Rem. Code § 17.042 (nonresident may be sued if, in addition to other acts that may constitute doing business, he contracts with a Texas resident, commits a tort in Texas, or recruits a Texas resident for employment inside or outside of Texas). Their only contention is that they never established minimum contacts in the state of Texas.

7

As indicated above, the touchstone of the minimum contacts analysis is purposeful availment. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010). Before a Texas court may exercise personal jurisdiction over a nonresident, the nonresident's contacts must show that he purposefully availed himself of the privileges and protections of the forum's laws. *Nogle & Black Aviation, Inc. v. Favaretto*, 290 S.W.3d 277, 281 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Appellants contend this standard has not been met for several reasons. Their first reason focuses on the conduct of Savino, who traveled to New York and New Jersey several times to discuss the parties' proposed business relationship. Appellants argue that the trial court could not exercise personal jurisdiction because Savino purposefully sought to invest outside of Texas. The focus of this argument is misplaced. In a jurisdictional analysis, "it is only the defendant's contacts with the forum that count." *Michiana*, 168 S.W.3d at 785. The unilateral activity of Savino, the plaintiff in this case, is not controlling. *Id.*; *Cerbone v. Farb*, 225 S.W.3d 764, 768 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Appellants contend next that minimum contacts have not been established because Dodd only made a single visit to Houston, whereas multiple face-to-face meetings between the parties occurred in New York and New Jersey. Based on Dodd's isolated trip, appellants argue that there has not been "continuous and systematic contact" in the state of Texas. Continuous and systematic contact is necessary only when a trial court exercises general jurisdiction over a nonresident, however. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16 (1984); *DENSO Corp. v. Hall*, 396 S.W.3d 681, 693 (Tex. App.—Houston [14th Dist.] 2013, no pet.). In this case, Savino invoked, and the trial court exercised, specific jurisdiction, not general jurisdiction.

Appellants also contend that their contract with a Texas resident is insufficient by itself to establish minimum contacts. It is true that "an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). A contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.* at 479. "It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.*

Appellants attempt to play down the significance of their prior negotiations. They argue that their phone calls, emails, and correspondence with Savino are of little value in a jurisdictional analysis because we live in an advanced society where interstate communications are commonplace. Appellants cite no authority for this proposition, however. The law is well-established that we must examine the quality and nature of the defendant's contacts, not their number or the ubiquity of their means. *Am. Type Culture Collection Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). Moreover, the question before us is not whether certain of appellants' contacts with Texas, standing alone, are sufficient to subject them to personal jurisdiction here. Instead, it is whether there is a substantial connection between all of appellants' Texas contacts, considered collectively, and the operative facts of the litigation. *P.V.F., Inc. v. Pro Metals, Inc.*, 60 S.W.3d 320, 326 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see also Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1206 (5th Cir. 1993); *Intercarga, S.A. v. Fritz*

*Cos.*, No. 14-02-00297-CV, 2003 WL 21402583, at *7 (Tex. App.—Houston [14th Dist.] June 19, 2003, no pet.) (mem. op.).

Appellants' contacts with Texas are stated in the trial court's findings of fact, which show as follows:

- Dodd mailed an offering memorandum to Savino, a Texas resident, soliciting Savino's investment in 3D Global.

- Over a span of several months, Dodd engaged in multiple telephone and email communications with Savino in Texas regarding the proposed investment.

- One term of the proposed investment provided that Savino would work for 3D Global as an oil trader from Savino's personal offices in Houston.

- Dodd executed an earnest money agreement with Savino, agreeing to refund Savino's earnest money payment in ten days if the investment failed to close.

- After receiving the earnest money payment, Dodd traveled to Houston voluntarily for the express purpose of conducting business in Texas.

- While in Houston, Dodd went to the offices of Ernst & Young, where he agreed to reimburse Savino for his share of the accounting firm's due diligence fee.

- While in Houston, Dodd also agreed to reimburse Savino for Savino's travel expenses to New York and New Jersey, where the offices of 3D Global are located.

Appellants did not present any evidence with their special appearance motion controverting these jurisdictional facts. In their brief, they attack the

sufficiency of only one of these findings, claiming that there is no evidence that appellants ever contemplated that Savino would work for 3D Global from a Houston-based office. This finding is plainly supported by the record, however. Savino testified by affidavit that his "employment as an oil trader working for 3D [Global] from Houston was an integral part of the proposed transaction." Savino also attached exhibits of email communications showing that the parties had negotiated Savino's salary and job title. We therefore reject appellants' sufficiency challenge. *See Herbert v. Greater Gulf Coast Enters.*, 915 S.W.2d 866, 872 (Tex. App.—Houston [1st Dist.] 1995, no writ) (finding must be upheld if there is any evidence of probative force to support it).

The record shows that appellants engaged in many dealings over several months, all of which were aimed at establishing a continuing business relationship with Savino, a Texas resident, and employing him in Texas. Although many of their communications occurred by phone and email, appellants' contacts included an actual trip to Texas, where the parties resumed their negotiations and executed contracts in furtherance of their proposed investment transaction. While appellants were in Texas, the parties engaged the Houston offices of Ernst & Young to perform due diligence on their transaction. After the due diligence revealed unfavorable findings, the parties' deal fell through, triggering the disputes that led to the instant lawsuit. We conclude that there is a substantial connection between appellants' purposeful contacts with Texas and the operative facts of Savino's litigation. *See Burger King*, 471 U.S. at 479; *Moki Mac*, 221 S.W.3d at 585. The trial court did not err by concluding that appellants had established sufficient minimum contacts in Texas.[3]

---

[3] We note that specific jurisdiction should be reviewed on a claim-by-claim basis. *See Moncrief Oil Int'l Inc. v. OAO Gazprom*, No. 11-0195, — S.W.3d —, 2013 WL 4608672, at *4 (Tex. Aug. 30, 2013). A separate analysis is not required in this case, however, because Savino

Once a court determines that a nonresident defendant has minimum contacts with the forum state, it must then decide whether exercise of personal jurisdiction offends traditional notions of fair play and substantial justice. *Burger King*, 471 U.S. at 476. We consider the following factors when making this determination: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental substantive social policies. *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 851 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Only in rare instances will the exercise of jurisdiction not comport with fair play and substantial justice. *Angelou v. African Overseas Union*, 33 S.W.3d 269, 281 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

The defendant bears the burden of presenting "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991). Despite this burden, appellants present no argument on this point.

As shown above, appellants are clearly capable of traveling to Texas. 3D Global is a large corporation with offices in more than one state. On this record, the exercise of jurisdiction in Texas would not impose an unreasonable burden on appellants. Furthermore, Texas has an obvious interest in providing a forum for resolving Savino's dispute. Two of the contracts at issue here were executed in Texas, and the other contract contemplated the creation of a business office in Texas, where Savino would personally work. The breach of these contracts plainly

---

bases each of his claims on the same set of contacts with Texas. *See id*. ("Of course, a court need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts.").

resulted in foreseeable harm to Savino, a Texas resident. We conclude that the exercise of personal jurisdiction comported with the constitutional requirements of due process. The trial court did not err by denying appellants' special appearance.

## MOTION FOR NEW TRIAL

We next consider appellants' motion for new trial, which was overruled by operation of law. We review a trial court's refusal to grant a new trial for an abuse of discretion. *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009) (per curiam). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

To set aside a default judgment, a defendant must usually establish the three factors set forth in *Craddock v. Sunshine Bus Lines, Inc.*, 133 S.W.2d 124 (Tex. 1939). These require a showing that (1) the failure to answer or appear was not intentional or the result of conscious indifference, but due to accident or mistake; (2) the defendant has a meritorious defense; and (3) the motion for new trial has been filed at such a time that granting it will not cause undue delay or injury to the plaintiff. *Id.* at 126. We address only the first factor because it is dispositive.

Consciously indifferent conduct occurs when "the defendant knew it was sued but did not care." *Fid. & Guar. Ins. Co. v. Drewery Constr. Co.*, 186 S.W.3d 571, 576 (Tex. 2006) (per curiam). This standard requires a showing of more than mere negligence. *Smith v. Babcock & Wilcox Constr. Co.*, 913 S.W.2d 467, 468 (Tex. 1995) (per curiam). It involves behavior such as a "pattern of ignoring deadlines and warnings from the opposing party." *Levine v. Shackelford, Melton & McKinley, L.L.P.*, 248 S.W.3d 166, 169 (Tex. 2008) (per curiam). We look to the knowledge and acts of the defaulting party to determine whether the failure to answer or appear was intentional or due to conscious indifference. *Dir., State*

*Emps. Workers' Comp. Div. v. Evans*, 889 S.W.2d 266, 269 (Tex. 1994). Generally, "some excuse, although not necessarily a good one, will suffice to show that a defendant's failure to file an answer was not because the defendant did not care." *In re R.R.*, 209 S.W.3d 112, 115 (Tex. 2006) (per curiam).

***The excuse.*** Appellants' argument focuses on the handling of this lawsuit by Haytham Faraj, the general counsel of 3D Global. Faraj received notice of the lawsuit on December 6, 2011, three full weeks before appellants' answer was due. Faraj prepared an answer and a special appearance, but he filed neither by the answer deadline. Faraj, who is not licensed in this state, explained in his affidavit that he lacked ready contacts in Texas who could file the pleadings on behalf of appellants. Faraj also attested that he was engaged in other matters that required considerable investments in time and attention. In mid-December, Faraj was involved in a high-profile case involving allegations of sexual assault in the military. As that trial was ongoing, Faraj was also preparing for another high-profile case, in which he was defending a United States marine accused of wartime atrocities in Iraq. This second case ended on January 24, 2012, with a plea deal that sparked public controversy. Hackers from the Internet group "Anonymous" were so upset with the plea deal that they broke into Faraj's email account and released more than three gigabytes worth of confidential email communications, client files, and financial records. Faraj claimed that this breach of security required immediate attention and contributed to his delay in filing an answer. According to appellants, Faraj "accidentally dropped the ball."

***The warnings.*** Savino counters with a series of events, which he argues show that appellants knew they were sued but did not care. On February 1, 2012, after the answer deadline had already passed, Faraj contacted Savino's attorney by telephone and acknowledged that a motion for default judgment had been pending.

14

Faraj did not request a continuance or a stay of the proceedings. He offered a settlement instead, but it was rejected by Savino's attorney. Faraj said that he would confer with appellants and propose another offer, but he never called back.

After the phone call, Savino prepared an amended motion for default judgment, which was filed on February 6 and set for a hearing on February 27. Savino served appellants with notice of this hearing, even though he had no legal duty to do so. *See Brooks v. Assocs. Fin. Servs. Corp.*, 892 S.W.2d 91, 94 (Tex. App.—Houston [14th Dist.] 1994, no writ) ("After a citation and petition are served on a defendant, the plaintiff has no legal duty to notify the defendant before taking a default judgment on the causes of action asserted in the petition."). Appellants did not respond to the notice, nor did they attend the hearing. The trial court accordingly entered its default judgment on February 29. A full month later, on March 30, appellants filed their *Craddock* motion for new trial.

The record shows that Faraj had actual awareness of the lawsuit three weeks before the answer deadline, and actual awareness of the default judgment at least a month before it was entered. Faraj prepared an answer and special appearance, but he never filed them. Faraj stated that he would propose a settlement offer after his first offer was rejected, but he never called back. Faraj also twice received notice of a pending motion for default judgment, yet he never responded. It was within the trial court's discretion to conclude that these facts fell within the rule stated in *Levine,* where the supreme court held that a "pattern of ignoring deadlines and warnings from the opposing counsel amounts to conscious indifference." *See Levine*, 248 S.W.3d at 169 (the defendants' attorney knew of deadline to file answer but did not do so, despite repeated discussions with the plaintiff and warnings of its intention to take a default judgment).

Appellants claim that, because they have proffered an excuse, the analysis should end. We disagree. *See Sutherland v. Spencer*, 376 S.W.3d 752, 755 (Tex. 2012) ("We do not hold that forgetfulness alone is sufficient to satisfy the first *Craddock* element . . . ."). Although "some excuse" is often found to be sufficient to set aside a default judgment, the supreme court has never held that *any* excuse will negate a defaulting party's intentional or consciously indifferent conduct. *R.R.*, 209 S.W.3d at 115. *Levine* illustrates this point well. In that case, the defendants' attorney requested a written standstill agreement before filing an answer, hoping that the parties would resolve their dispute through mediation. When the plaintiffs refused, the attorney promised to file an answer by the deadline, but he never did so. Having received no answer, the plaintiffs advised the attorney that a default judgment would be taken. The attorney assured the other side that he would file an answer by the end of the week, but again he never did so. The plaintiffs subsequently filed a motion for default judgment, which the trial court granted without hearing. On appeal, the supreme court upheld the default judgment, despite the attorney's claim that he had placed an answer in his outgoing mail bin four days before the default judgment was signed. The supreme court held that the attorney's excuse was wholly insufficient because the attorney knew his answer date, he did not attempt to confirm that his answer had been filed, and he engaged in a pattern of ignoring deadlines and warnings. *Levine*, 248 S.W.3d at 168–69.

Following *Levine*, appellants needed to demonstrate that Faraj's excuse, if true, negated his failure to respond to the warnings from opposing counsel. Appellants did not meet this burden. Faraj claimed in non-specific terms that he was preoccupied with remedying the damage caused by the hacking incident, but Faraj never explained when the hacking incident occurred or how much time his remedial efforts actually consumed. The timing of such matters is critical to a

16

*Craddock* analysis, but Faraj's affidavit is completely silent on this point. *Cf. Sutherland*, 376 S.W.3d at 755 (the first *Craddock* element was satisfied where the defaulting party claimed that he was unable to return to the office "due to weather conditions over a nearly three-week period during the Christmas holiday season"). The affidavit does not indicate whether the hacking incident occurred before or after the telephone conference on February 1, when Savino's attorney warned Faraj of a looming default judgment. Nor does the affidavit establish that Faraj was so busy restoring his email security that he was incapable of filing an answer by February 29, when the trial court entered its default judgment.

This is not a case of an accident or mistake, where, for instance, the suit papers were lost or a party was misguided about his obligation to respond. *See, e.g.*, *Drewery*, 186 S.W.3d at 575–76 (suit papers were discarded); *R.R.*, 209 S.W.3d at 115 (defendant believed she would have been appointed counsel); *Evans*, 889 S.W.2d at 269 (predecessor attorney misdated the trial date and conveyed the wrong information to successor). Faraj, an experienced litigator, knew the consequences of failing to answer, and even had prepared an answer and special appearance. Faraj claims that he could not file these pleadings because he lacked ready contacts in Texas, but as Savino points out, Faraj never even attested that he searched for local counsel before the trial court entered its default judgment. We do not doubt that the hacking incident was serious, but when viewed in the context of the entire record, Faraj has not established that this excuse negates his conscious indifference to the warnings from opposing counsel.

Appellants cannot show that their failure to answer was due to accident or mistake. Because they are unable to satisfy their burden under the first *Craddock* element, appellants are not entitled to set aside the trial court's default judgment.

The trial court did not abuse its discretion by overruling their motion by operation of law.

## ALTER EGO LIABILITY

In their next issue, appellants argue that the trial court erred by signing a judgment against Dodd as an individual, claiming that the pleadings fail to support a theory of alter ego liability. Appellants also argue that, to the extent the pleadings are not deficient, there is no evidence of alter ego.

Generally, the owner of a corporation is not liable for the contractual obligations of his corporation. *See* Tex. Bus. Orgs. Code § 21.223(a)(2). This rule is subject to the alter ego exception, which provides that the owner may be held liable if the obligee demonstrates that the owner "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the . . . owner." *See id.* § 21.223(b). The alter ego doctrine applies "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 387 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Actual fraud involves dishonesty of purpose or intent to deceive. *See Castleberry*, 721 S.W.2d at 273.

Appellants argue that the pleadings are deficient because Savino did not specifically allege that Dodd had committed an actual fraud for his own benefit. We conclude that appellants failed to preserve error on this point. Under Rule 33.1, "the overruling by operation of law of a motion for new trial . . . preserves for appellate review a complaint properly made in the motion." Tex. R. App. P. 33.1(b). In their motion for new trial, appellants challenged Dodd's individual

liability by arguing only the following: (1) that Dodd was CEO of 3D Global at all times relevant to the instant lawsuit; (2) that all of Dodd's actions with respect to Savino were performed in Dodd's professional capacity as CEO; and (3) that Dodd never commingled his funds with 3D Global. Nowhere in their motion did appellants complain about a deficiency in the pleadings or a failure by Savino to allege that Dodd had committed an actual fraud for his own benefit. Appellants' complaint is therefore forfeited.

Even if we were to assume that appellants' complaint was properly before this court, we would still conclude that their argument is incorrect. A default judgment will be held erroneous only if (1) the petition does not attempt to state a cause of action that is within the jurisdiction of the court, (2) the petition does not give fair notice to the defendant of the claim asserted, or (3) the petition affirmatively discloses the invalidity of such claim. *Paramount Pipe & Supply Co., v. Muhr*, 749 S.W.2d 491, 494 (Tex. 1988). Appellants do not contend that Savino's cause of action is unrecognized, outside the jurisdiction of the court, or affirmatively invalidated by the petition. Their only dispute is whether Savino's petition gave fair notice of Dodd's alter ego liability.

An original petition must contain "a short statement of the cause of action sufficient to give fair notice of the claim involved." Tex. R. Civ. P. 47(a). The pleader satisfies this "fair notice" standard if the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense. *Id.* at 897. A petition is construed liberally in favor of the pleader if no special exceptions are filed. *Id.* "But, 'liberally' does not

19

require a court to read into a petition what is plainly not there." *Wortham v. Dow Chem. Co.*, 179 S.W.3d 189, 199 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Alter ego, or piercing the corporate veil, is not an independent cause of action, but is instead a means of imposing liability for an underlying cause of action. *Wilson v. Davis*, 305 S.W.3d 57, 68 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Alter ego is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately; the amount of financial interest, ownership, and control the individual maintains over the corporation; and whether the corporation has been used for personal purposes. *Castleberry*, 721 S.W.2d at 272. Evidence as proof of an alter ego includes (1) the payment of alleged corporate debts with personal checks or other commingling of funds, (2) representations that the individual will financially back the corporation, (3) the diversion of company profits to the individual for the individual's personal use, (4) inadequate capitalization, and (5) any other failure to keep corporate and personal assets separate. *Burchinal v. PJ Trailers-Seminole Mgmt. Co., LLC*, 372 S.W.3d 200, 218 (Tex. App.—Texarkana 2012, no pet.) (citing *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 229 (Tex. 1990)).

Savino gave adequate notice to Dodd that he was being sued under an alter ego theory of liability. Savino consistently referred to both Dodd and 3D Global as the breaching parties in his original petition. Savino also made specific factual allegations supporting the existence of an alter ego and of actual fraud, including the commingling of funds, the diversion of company profits to an individual, and inadequate capitalization.[4] Finally, Savino explicitly alleged in the "Parties"

---

[4] Savino's exact allegations are as follows:

20

section of his petition that "3D Global Solutions was and functioned at all relevant times as Mr. Dodd's agent and alter ego."

Appellants suggest that these pleadings are somehow insufficient because Savino did not "specifically plead the reasons raised for piercing the corporate veil," nor did he ask the trial court to make a finding of actual fraud. Appellants essentially contend that Savino was required to allege that Dodd had committed an "actual fraud" for his own benefit, and that without such specific pleadings, the default judgment was improper. We disagree. The case law is clear that a petition is sufficient if a cause of action may reasonably be inferred from what is specifically stated in the petition, "even if an element of the cause of action is not specifically alleged." *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993); *Westcliffe, Inc. v. Bear Creek Constr., Ltd.*, 105 S.W.3d 286, 292 (Tex. App.—Dallas 2003, no pet.); *see also* Tex. R. Civ. P. 45(b) ("That an allegation be evidentiary or be of legal conclusion shall not be grounds for objection when fair notice to the opponent is given by the allegations as a whole."). Actual fraud, a component of

---

20. On or about July 16, 2011, Mr. Savino provided the agreed earnest money by a wire transfer of $150,000 from his bank account at Chase Bank in Houston, Texas to Mr. Dodd's personal bank account in Elkhart, Indiana. . . .

29. During the due diligence, Mr. Savino learned facts indicating that Mr. Dodd and 3D Global Solutions commingled funds and did not maintain proper corporate separation between Mr. Dodd's personal assets and 3D Global Solutions' assets. Mr. Dodd received funds intended for 3D Global Solutions into his personal bank account. Mr. Dodd also solicited Mr. Savino and Augusta to approve the use of $1.2 million in investment proceeds from the proposed transaction to make payments to him personally.

30. Also during the course of the due diligence, Mr. Savino learned facts indicating that 3D Global Solutions was not adequately capitalized. . . .

31. Ernst & Young was not able to validate the $10,500,000 net present value for 3D Global Solutions that Mr. Dodd and 3D Global Solutions had represented in the offering memorandum.

21

alter ego liability, involves "dishonesty of purpose or intent to deceive." *See Castleberry*, 721 S.W.2d at 273. The intent to deceive can be inferred because Savino's factual allegations, when taken as true, support a finding that Dodd solicited an investment in 3D Global after misrepresenting its net present value. Based on the pleadings here, we conclude that an opposing attorney of reasonable competence could have ascertained Dodd's alter ego liability. *See Elite Door & Trim, Inc. v. Tapia*, 355 S.W.3d 757, 766 (Tex. App.—Dallas 2011, no pet.); *Schlueter v. Carey*, 112 S.W.3d 164, 168–69 (Tex. App.—Fort Worth 2003, pet. denied).

Appellants also broadly challenge the sufficiency of the evidence supporting the theory of alter ego. However, in a no-answer default, the defendant admits all facts properly pleaded in the plaintiff's petition, except for the amount of unliquidated damages. *Dolgencorp*, 288 S.W.3d at 930. If the facts set forth in the petition allege a cause of action, the default judgment conclusively establishes the defendant's liability. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984); *see also Boyles*, 855 S.W.2d at 601 (elements may be reasonably inferred from what is specifically alleged even if an element of a cause of action is not specifically alleged). Consequently, appellants are precluded from asserting a challenge as to the sufficiency of the evidence. *See Norton v. Martinez*, 935 S.W.2d 898, 901 (Tex. App.—San Antonio 1996, no pet.) ("Appellants may not now challenge the sufficiency of the evidence where their failure to answer constitutes an admission of such liability.").

## DAMAGES

In their final issue, appellants contend there is no evidence of either breach of contract or of unliquidated damages. For reasons just stated, appellants cannot dispute the sufficiency of Savino's breach of contract claims because the default

22

judgment conclusively establishes their liability. *See Dolgencorp*, 288 S.W.3d at 930; *Morgan*, 675 S.W.2d at 731. Accordingly, we consider only whether the evidence is sufficient to support the award of unliquidated damages. *See* Tex. R. Civ. P. 243; *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992).

The final judgment awards Savino $187,386.90, plus interest. The largest portion of this award represents the reimbursement of $150,000 in earnest money, which appellants do not appear to challenge. The remaining share consists of the reimbursement of the Ernst & Young fee ($20,000), the reimbursement of Savino's travel expenses ($4,986.87), and the award of reasonable and necessary attorney's fees ($12,400). Appellants contend there is no evidence to support these specific awards, other than conclusory and self-serving statements, because there is no reporter's record of the default judgment hearing. We address the contract damages first.

## A.  Contract Damages

In the affidavit attached to his amended motion for default judgment, Savino attested that he and Augusta had collectively paid $40,000 to Ernst & Young, or two-thirds of the accounting firm's $60,000 fee. Savino also attached an invoice from Ernst & Young, which showed an outstanding balance of $20,000. Savino further attested that he had incurred $4,986.87 in travel expenses, which he supported with two authenticated expense reports.

During a default judgment proceeding, affidavit testimony will support the award of unliquidated damages if the affidavit avers personal knowledge of the facts, describes the circumstances that resulted in the loss, and identifies the total amount owed as a result. *See Tex. Commerce Bank, Nat'l Ass'n v. New*, 3 S.W.3d 515, 517 (Tex. 1999) (per curiam). Savino's affidavit does precisely that. Savino attested that appellants had agreed to bear one-third of the fees charged by Ernst &

Young, and that Ernst & Young had issued an invoice for a total amount of $60,000. Savino also attested that appellants agreed to reimburse certain travel expenses, and that Savino had duly submitted documentation of these expenses in the amount of $4,986.87. We conclude that this evidence is sufficient to support the award of contract damages, notwithstanding the absence of a hearing transcript. *See id.* (upholding damages award on affidavit testimony where no oral testimony was taken at the default judgment hearing). Furthermore, because Savino described the underlying bases to support his claim for damages, we reject appellants' suggestions that his affidavit is conclusory or self-serving. *See Dolcefino v. Randolph*, 19 S.W.3d 906, 930 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("A conclusory statement is one that does not provide the underlying facts to support the conclusion.").

## B.    Attorney's Fees

Savino's attorney's fees award is supported by the affidavit of Amy Tabor, his retained trial counsel. Tabor attested that she spent approximately thirty-three hours working on the case. Based on her hourly rate of $375, Savino incurred a bill in the amount of $12,400. Tabor attested that these fees were reasonable and necessary "considering the nature of the case and the difficulty of the questions involved."

Appellants attack this affidavit for similar reasons as before, claiming that it is conclusory and self-serving. Appellants also complain that the evidence is legally insufficient because Tabor did not attach any invoices, nor did she explain why more than thirty hours of work was necessary on this case.

We disagree with appellants' argument that Tabor's affidavit is conclusory. Tabor attested that she is a duly licensed attorney and that she had personal knowledge of the work performed. Tabor specifically indicated that she had

24

investigated claims, reviewed documents, drafted pleadings, and performed other actions necessary to her duties. Tabor's affidavit testimony was sufficient by itself to support the award of attorney's fees. *See New*, 3 S.W.3d at 517–18.

We also reject appellants' argument that Tabor failed to explain the reasonableness of her fees. Tabor attested that her fees were based on a fixed hourly rate and the difficulty of the questions involved. These are factors described in *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997), which courts may consider when determining the reasonableness of attorney's fees. *See also Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 706 (noting that there is no requirement that an attorney prove up the reasonableness of her fees with each of the *Arthur Andersen* factors).

We conclude that the evidence is legally sufficient to support the award of unliquidated damages.[5]

## CONCLUSION

We overrule appellants' four issues and affirm the judgment of the trial court.

/s/  Martha Hill Jamison
    Justice

Panel consists of Justices Boyce, Jamison, and Busby.

---

[5] The trial court awarded three cents more than the amount of damages claimed by Savino in the affidavits attached to his amended motion for default judgment. Appellants have not raised a specific complaint regarding this discrepancy. We are not inclined to disturb the trial court's judgment because of this *de minimis* amount.

25