**Affirmed and Memorandum Opinion filed February 2, 2021**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00790-CV

## CALYX ENERGY III, LLC, Appellant

## V.

## ENERFIN RESOURCES I LIMITED PARTNERSHIP, Appellee

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2019-02865**

## MEMORANDUM OPINION

Appellee Enerfin Resources Limited Partnership ("Enerfin") filed suit alleging a breach of contract claim against appellant Calyx Energy III, LLC. ("Calyx") Calyx, which is not a Texas resident, filed a special appearance. The trial court denied Calyx's special appearance and Calyx filed this interlocutory appeal challenging the trial court's denial. Concluding that the trial court did not err when it denied Calyx's special appearance, we affirm.

## BACKGROUND

Enerfin is a Texas limited partnership with its principal place of business in Houston, Texas. Enerfin owns and operates natural gas pipelines, compression equipment, processing plants, and treating facilities, and oil and gas production. Enerfin has operations in Texas, Oklahoma, Louisiana, California, and Oregon. Calyx is a Delaware limited liability company with its main office in Tulsa, Oklahoma. Calyx owns real property and natural gas wells in Oklahoma. Prior to the contract at issue in this lawsuit, Calyx and its related entities were parties to several multi-year gas purchase contracts with Enerfin dating back to 2008.

Calyx approached Enerfin about entering into a contract for Enerfin to gather gas from a project Calyx was developing on new acreage in Oklahoma. The first meeting regarding the new acreage occurred at a restaurant in Oklahoma in December 2016. A subsequent meeting took place in Enerfin's Houston office in January 2017. The Calyx personnel who attended the Houston meeting included Calyx's Vice President, Chief Financial Officer, and General Counsel Jim Stephenson and Calyx's Operations Manager, Roger DeMuth. Stephenson offices in Texas and frequently lists his office address as a business address for Calyx in his Calyx communications. Stephenson confirmed in his deposition that when he attended the January 2017 meeting, he did so in his capacity as an officer of the company.

After the initial meetings, Calyx and Enerfin negotiated the Gas-Gathering Contract primarily by emails between Stephenson and DeMuth for Calyx, and Tom Guinn and Dave Cremer for Enerfin. It is undisputed that Stephenson, who served as Calyx's vice president, chief financial officer, and general counsel, participated in these negotiations from his office located in Texas. The Gas-Gathering Contract was signed in March 2017. It does not contain a provision mandating or limiting

2

the venue or jurisdiction for disputes that might arise between the parties. It does however, contain a choice-of-law provision stating that the contract would be governed by Oklahoma law. The parties agreed to an initial one-year term for the agreement. The Gas-Gathering Contract also provided that it would automatically renew for subsequent one-year terms unless one of the parties gave written notice of cancellation at least sixty days before the end of the initial one-year term, or any subsequent one-year term.[1]

The Gas-Gathering Contract required Calyx to provide monthly nominations to Enerfin identifying the volume of gas Calyx would deliver to Enerfin. The monthly nominations had to include the information Enerfin deemed necessary to allocate and account for the volumes of nominated gas. To comply with the monthly nomination requirement, Calyx contracted with BP Energy Company ("BP") for BP employees officed in Houston, Texas, to serve as Calyx's "exclusive agent." Pursuant to that "Operational Agency Agreement," BP would "manage and administer" the Gas-Gathering Contract on behalf of Calyx.

The Operational Agency Agreement sets forth BP's responsibilities to perform the Gas-Gathering Contract on Calyx's behalf. Among other things, BP, as Calyx's agent, was responsible for (1) "prepar[ing] and submit[ting] daily and monthly nominations, as applicable, to facilitate Calyx's delivery of Gas at the [Gas-Gathering Contract] Delivery Point(s)," (2) "manag[ing] the applicable Gathering Capacity" contracted for in the Gas-Gathering Contract; (3) "manag[ing] any critical Day events or operational issues affecting the Gathering Capacity" contracted for in the [Gas-Gathering Contract]; and (4) "balanc[ing] Gas delivery activities." The Operational Agency Agreement also required Calyx to provide

---

[1] The parties incorporated three exhibits, A, B, and C, into the contract. Exhibit C contains the general terms and conditions applicable to the contract.

certain information to BP in Houston on a regular basis so that BP could manage the Gas-Gathering Contract as Calyx's agent. The Operational Agency Agreement provided that all notices and communications from Calyx to BP were to be sent to Chelsea Sandberg of BP in Houston, Texas, and all notices and communications from BP to Calyx were to be sent to Stephenson, Calyx's general counsel, at Calyx Energy III, LLC located on Post Oak Drive in Houston, Texas. Once Calyx had retained BP to act as Calyx's agent, Stephenson forwarded the Gas-Gathering Contract to Sandberg at her Houston office. The Gas-Gathering Contract provides that all notices, requests, demands, statements, and payments must be sent to Enerfin's Houston, Texas office. Pursuant to that requirement, each month BP, Calyx's Texas-based agent, sent Calyx's gas nominations to Enerfin in Houston.

Sandberg notified Enerfin that BP would act as Calyx's agent under the Gas-Gathering Contract. She also provided Enerfin with her contact information in Houston so that she could serve as the point of contact to manage the Gas-Gathering Contract and Calyx's obligations thereunder. Representing BP as Calyx's agent, Sandberg and another BP employee located in Houston worked with Enerfin employees and agents in Houston to coordinate the nomination and allocation process for the gas that Calyx would deliver to Enerfin under the terms of the Gas-Gathering Contract. Sandberg was in frequent contact with Enerfin on Calyx's behalf. At times, Calyx employees also communicated directly with Enerfin's gas scheduler in Houston about operational issues related to the Gas-Gathering Contract.

In addition to appointing an agent in Texas to manage the Gas-Gathering Contract for Calyx, Calyx officers and employees made phone calls and sent emails to Enerfin in Texas regarding operations pursuant to the agreement. They also attended in-person meetings with Enerfin in Texas where issues related to the

agreement were discussed. On April 4, 2017, Stephenson met with Enerfin's Dave Cremer and Tom Guinn at Enerfin's Houston office. Among other things, they discussed Calyx's progress in testing the first two wells that would be connected to Enerfin's gas-gathering system. Two months later, DeMuth, Calyx's Operations Manager, met with Guinn and George McCarty, Enerfin's Director of Engineering, in Dallas to discuss progress related to the first wells that Calyx connected to Enerfin under the Gas-Gathering Contract. They also discussed how Enerfin intended to credit Calyx under the Gas-Gathering Contract for the richness of the gas being produced by Calyx's wells.

In addition to regular interaction regarding performance of the Gas-Gathering Contract, Calyx initiated discussions with Enerfin about the creation of a joint venture between the two companies. The concept for the joint venture entailed both companies contributing certain specified assets, including the assets involved in the Gas-Gathering Contract, to the joint venture. Enerfin would then operate those assets for the mutual benefit of the joint venturers. Calyx and Enerfin executed a confidentiality agreement in connection with the joint venture discussions.

About six months after the parties had signed the Gas-Gathering Contract, on September 25, 2017, Calyx sent a letter notifying Enerfin that it was terminating the Gas-Gathering Contract effective April 30, 2018. Stephenson sent the notice of termination from his office in Houston. However, after sending its notice of termination, Calyx reached out to Enerfin to discuss the Gas-Gathering Contract. In a series of phone calls and in-person meetings, representatives of the two companies discussed connecting additional wells under the terms of the Gas-Gathering Contract. They also discussed the differing viewpoints regarding Calyx's right to terminate the contract at the time it sent the notice. The two

5

companies also discussed possibly resolving the disagreement by entering into a new joint venture or gas-gathering agreement. These discussions were not successful however, and Calyx ceased nominating and delivering gas to Enerfin on May 31, 2018.

Enerfin filed suit alleging that Calyx breached the Gas-Gathering Contract. Enerfin alleged that Calyx sent notice to Enerfin in Texas purporting to terminate the Gas-Gathering Contract in violation of the agreement's Primary Term provision. According to Enerfin, Calyx had developed additional wells and had connected those wells to Enerfin's system which had the effect of extending the Primary Term of the Gas-Gathering Contract until at least February 1, 2019. Enerfin specifically alleged that Calyx breached the Gas-Gathering Contract when its Texas-based agent stopped nominating and delivering gas to Enerfin as required by the Gas-Gathering Contract before the end of that extended Primary Term.

Calyx filed a special appearance objecting to personal jurisdiction in Texas. Calyx initially argued that Enerfin had not pleaded sufficient facts to establish jurisdiction, and that Calyx was not subject to specific or general jurisdiction in Texas. The parties conducted discovery relating to Calyx's special appearance and Enerfin filed amended petitions with additional jurisdictional facts against Calyx. Enerfin also filed a response with evidence attached to Calyx's special appearance. Calyx subsequently filed a reply brief in support of its special appearance in which it asserted only one argument challenging the trial court's personal jurisdiction over it: Calyx is not subject to specific jurisdiction because "the operative facts in this case relate exclusively to events that occurred in Oklahoma." Enerfin responded by pointing out that Calyx's substantial contacts with Texas in negotiating, performing, and then breaching the Gas-Gathering Contract in Texas related to Enerfin's breach-of-contract claim.

The trial court held a non-evidentiary hearing on Calyx's special appearance. The trial court denied Calyx's special appearance. Calyx subsequently filed this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7).

ANALYSIS

In a single issue, Calyx argues that the trial court erred when it denied its special appearance because "there is no connection, much less a substantial connection, between Calyx's purported contacts with Texas and the operative facts underlying Enerfin's breach of contract claim." We disagree.

## I.     Standard of Review and Applicable Law

We review de novo a trial court's denial of a special appearance. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017). When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Parties may challenge the legal and factual sufficiency of these implied factual findings. *Id*.

In a legal sufficiency review, we view the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding, crediting favorable evidence if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *Dodd v. Savino*, 426 S.W.3d 275, 284 (Tex. App.—Houston [14th Dist.] 2014, no pet. (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We will set aside a finding on legal sufficiency grounds only if (a) there is a complete absence of a vital fact, (b) we are barred by legal or evidentiary rules from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a

7

vital fact is no more than a scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Id*. In reviewing for factual sufficiency, we consider all the evidence; we will set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id*. Finally, we review the trial court's legal conclusions de novo. *Id*.

The Texas long-arm statute authorizes Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in the state. Tex. Civ. Prac. & Rem. Code § 17.042. The Supreme Court of Texas has interpreted the broad language of the Texas long-arm statute to extend Texas court's personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *M & F Worldwide*, 512 S.W.3d at 885. A plaintiff bears the initial burden of pleading allegations sufficient to bring a nonresident defendant within the scope of the long-arm statute. *BMC Software*, 83 S.W.3d at 794–95. A defendant challenging a Texas court's personal jurisdiction must negate all jurisdictional bases alleged. *Id*.

A trial court may constitutionally exercise personal jurisdiction over a party when (1) the nonresident defendant has minimum contacts with the forum state and (2) the assertion of jurisdiction complies with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Peters v. Top Gun Exec. Grp.*, 396 S.W.3d 57, 62 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *M & F Worldwide*, 512 S.W.3d at 886. "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas

court." *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

A nonresident defendant's contacts with a forum state can give rise to either general or specific jurisdiction. *Id*. Only specific jurisdiction is at issue here. In analyzing specific jurisdiction, we focus on the relationship among the defendant, the forum, and the particular litigation at hand. *See M & F Worldwide*, 512 S.W.3d at 886 (citing *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010) and *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575-76 (Tex. 2007)). Specific jurisdiction is established when the plaintiff's cause of action arises from or relates to the defendant's alleged minimum contacts within the forum. *Id*. For specific jurisdiction purposes, a defendant's minimum contacts with a forum are established when the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id*. (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). Three principles govern the purposeful-availment analysis: (1) "only the defendant's contacts with the forum" are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be "purposeful" and not "random, isolated, or fortuitous"; and (3) the defendant "must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction" such that it impliedly consents to suit there. *Id*. "The defendant's activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court." *Id*.

In the present case general jurisdiction is not at issue and Enerfin has asserted only a single cause of action, breach of contract, against Calyx. Specific

jurisdiction is transaction focused. *Napoli, Bern, Ripka, Shkolnik & Associates, LLP v. Stratos Legal Servs.*, No. 14-18-00420-CV, 2019 WL 2589885, at *4 (Tex. App.—Houston [14th Dist.] June 25, 2019, no pet.) (mem. op.). A trial court has specific jurisdiction over a nonresident defendant when (1) the defendant's contacts with the forum state are purposeful, and (2) the plaintiff's cause of action arises from or relates to those contacts. *Id.*

## II. The trial court did not err when it denied Calyx's special appearance because Enerfin's breach of contract claim arises from, and has a substantial connection with, Calyx's Texas contacts.

In its single issue, Calyx challenges only the second element above, arguing that Enerfin's breach of contract claim did not arise out of or relate to Calyx's Texas contacts. For a cause of action to arise from or relate to purposeful forum contacts, there must be a substantial connection between those contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585. In making its argument that there is no substantial connection between its contacts with Texas and the operative facts of the litigation, Calyx dissects them, and then addresses each individually. But, this is not the proper analysis. *See Dodd*, 426 S.W.3d at 286 ("[T]he question before us is not whether certain of appellants' contacts with Texas, standing alone, are sufficient to subject them to personal jurisdiction here."). Instead, the proper analysis "is whether there is a substantial connection between all of appellants' Texas contacts, considered collectively, and the operative facts of the litigation." *Id.* As summarized above, Calyx had numerous contacts with Texas related to Enerfin and the Gas-Gathering Contract. While each, individually, may be insufficient to establish jurisdiction, as explained below we conclude they collectively establish that Calyx had a substantial connection with Texas.

Prior to the events at issue here, Calyx had a pre-existing, long-term

10

business relationship with Enerfin. In addition, the Gas-Gathering Contract created a continuing relationship between the two companies. This establishes that Calyx's contacts with Texas cannot be described as "random, isolated, or fortuitous." *Moki Mac*, at 575. Nor do they create "an attenuated affiliation with the forum." *See id.* at 577 (internal quotation marks omitted). It was Calyx that reached out to Enerfin in pursuit of a new gas-gathering agreement. Businesses that reach out beyond one state to create continuing relationships and obligations with citizens of another state are subject to jurisdiction of the latter in suits "based on their activities." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (internal quotation marks omitted); *see Billingsley Parts & Equip., Inc. v. Vose*, 881 S.W.2d 165, 169 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (finding specific jurisdiction when, among other factors, nonresident defendant made initial contact with Texas company).

Additionally, while not a Texas resident, Calyx maintained a Texas office where Stephenson, Calyx's vice president, chief financial officer, and general counsel, worked.[2] While there is evidence in the record that the start of the negotiations leading to the Gas-Gathering Contract took place at a restaurant in Oklahoma, the record also contains evidence establishing that the negotiations continued through communications sent to Enerfin that were initiated by Calyx in Texas, and also during in-person meetings in Texas. (CR92-93, 98-99, 105, 119, 153) The record also establishes that it was Stephenson, based in Texas, who led the negotiations on behalf of Calyx. *See Dodd*, 426 S.W.3d at 285–87 (concluding, after examining parties' contract negotiations and communications, that there was "a substantial connection between appellants' purposeful contacts

---

[2] While Calyx attempts to minimize the significance of this office by describing it as Stephenson's "personal law office," the record contains communications sent by Stephenson to Enerfin which identify his office located in Houston, Texas as a Calyx office.

with Texas and the operative facts of Savino's litigation"); *Peters*, 396 S.W.3d at 63 ("In contract disputes, we must consider the parties' prior negotiations, the contemplated future consequences, the terms of the contract, and the actual course of dealing of the parties."); *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 553–54 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (concluding that trial court had specific jurisdiction over out-of-state defendant based in part on in-person office meetings in Texas where defendant's agent and point man discussed deal). Finally, Calyx sent a signed copy of the executed Gas-Gathering Contract to Enerfin in Texas. This also qualifies as a purposeful contact with Texas. *See Parker v. Robert Ryan Realtors, Inc.*, No. 14-10-00325-CV, 2010 WL 4226550, at \*5 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.) (stating that sending signed contracts to Texas was a purposeful contact to be considered in jurisdictional analysis).

Calyx also had extensive purposeful contacts with Texas in connection with its performance of the Gas-Gathering Contract. Perhaps Calyx's most important contact with Texas regarding its performance of the agreement was the appointment of a formal agent, BP, in Houston, Texas, "to manage and administer" Gas-Gathering Contract on Calyx's behalf. In its role as Calyx's agent, BP worked on an almost daily basis with Enerfin to coordinate the nomination and allocation process for the gas that Calyx would deliver to Enerfin pursuant to the Gas-Gathering Contract. It was also BP that ceased nominating and delivering gas to Enerfin. These actions by a Texas-based agent to perform Calyx's duties under the Gas-Gathering Contract, can all be attributed to Calyx, BP's principal. *See Parker*, 2010 WL 4226550, at \*5 ("[I]n a principal-agent relationship, the contacts of the agent may be imputed to the principal for the purposes of personal jurisdiction."); *Walker Ins.*, 108 S.W.3d at 549, n.4 ("For purposes of personal jurisdiction, the

12

actions of an agent may be attributed to the principal."); *Mort Keshin & Co., Inc. v. Houston Chronicle Pub. Co.*, 992 S.W.2d 642, 647 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("When an agent negotiates a contract for its principal in Texas, it is the principal who does business in this state, not the agent.").

Calyx places a great deal of emphasis on the Oklahoma location of the gas throughout its appellate briefing. We conclude that this undisputed fact has little connection to the operative facts of this litigation. Further, we are called to focus on the out-of-state defendant's contacts with Texas. *See Michiana Easy Livin' Country, Inc.*, 168 S.W.3d at 785 ("[I]t is only the defendant's contacts with the forum that count"). Thus, at least in this case, the relevant jurisdictional facts are not the physical location of the gas and the pipeline, but the purposeful contacts Calyx had with Texas in its efforts to profit from that gas. Calyx also points out the existence of the choice-of-law clause in the Gas-Gathering Contract. While this is a factor to consider in the jurisdictional analysis, it is not dispositive. *Hoagland v. Butcher*, 396 S.W.3d 182, 194, n.13 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). We conclude that the focus of this dispute will not be on anything that happened in Oklahoma.

The focus will instead be on the terms of the Gas-Gathering Contract that was largely negotiated and performed in Texas and whether Calyx had the contractual authority to terminate the agreement. In conducting a personal-jurisdiction analysis, we review the claims in question and the evidence regarding the jurisdictional facts, but we do not determine the merits of the claims. *See TV Azteca, S.A.B. De C.V. v. Ruiz*, 490 S.W.3d 29, 35 n.1 (Tex. 2016); *Dresser-Rand Group v. Centauro Capital, S.L.U.*, 448 S.W.3d 577, 584 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Without commenting on the merits of Enerfin's claims, we conclude that there is a substantial connection between Calyx's Texas contacts

and the operative facts of the litigation. *See Moki Mac*, 221 S.W.3d at 585; *Dodd*, 426 S.W.3d at 285–87 (concluding, after examining parties' contract negotiations and communications that there was "a substantial connection between appellants' purposeful contacts with Texas and the operative facts of Savino's litigation"); *Parker*, 2010 WL 4226550, at *5 (concluding there was personal jurisdiction because there was a substantial connection between agent's Texas contacts and the operative facts of the litigation); *Walker Ins.*, 108 S.W.3d at 553 (concluding trial court had personal jurisdiction over defendant based in part on agent's pre-litigation activities). We overrule Calyx's single issue on appeal.

## CONCLUSION

Having overruled Calyx's issue on appeal, we affirm the trial court's denial of Calyx's special appearance.

/s/    Jerry Zimmerer
Justice

Panel consists of Justices Zimmerer, Poissant, and Wilson.

14