

## NUMBER 13-13-00306-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

---

**MI GWANG CONTACT LENS CO., LTD. AND
CLEARLAB US, INC.,**                                               **Appellants,**

**v.**

**M. TERRI CAVAZOS CHAPA, INDIVIDUALLY
AND AS NEXT FRIEND AND NATURAL
GUARDIAN OF VICTORIA CHAPA, A MINOR,**               **Appellees.**

---

### On appeal from the 103rd District Court
### of Cameron County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Perkes and Longoria
Memorandum Opinion by Chief Justice Valdez**

Appellants, Mi Gwang Contract Lens Co., LTD. ("Mi Gwang") and Clearlab US,

Inc. ("Clearlab"), challenge the trial court's order denying their special appearances. *See*

TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West, Westlaw through 2013 3d C.S.).
We affirm.

## I. BACKGROUND

In July 2010, Victoria Chapa, who was then fourteen years old, purchased a pair of cosmetic contact lenses from a kiosk in the Brownsville Sunrise Mall in Brownsville, Texas. Soon thereafter, she experienced a corneal ulcer and infection in her left eye as a result of using the contact lenses. Victoria subsequently lost significant vision in her left eye. As a result, Victoria's mother, M. Terri Cavazos Chapa, brought suit, individually and on behalf of Victoria, in the 103rd District Court of Cameron County, Texas against multiple defendants,[1] including Mi Gwang and Clearlab, for, inter alia, negligence and negligence per se regarding their sale and distribution of cosmetic contact lenses.

Mi Gwang and Clearlab filed special appearances contesting both general and specific jurisdiction. The Chapas filed a combined response to these special appearances. Mi Gwang and Clearlab filed a combined reply and brief in support of their special appearances. The Chapas filed a supplemental brief in support of their combined response and further filed a response to Mi Gwang and Clearlab's combined reply and brief. Following a non-evidentiary hearing, the trial court denied the special appearances. This appeal ensued. By three identical issues raised in separate briefs, Mi Gwang and Clearlab each contend: (1) the trial court erroneously denied the special appearances because the Chapa's pleadings failed to support their assertion of personal jurisdiction;

---

[1] In addition to Mi Gwang and Clearlab, appellants brought suit against Precision Optical Products, LLC, AM Wholesale, Inc., AM1 Wholesale, Inc., Amafhh International, Inc., CBL & Associates Properties, Inc., CBL & Associates Management, Inc., CBL SM-Brownsville, LLC, ERMC II, L.P., ERMC III Property Management Company, LLC, ERMC IV, L.P., ERMC of America, LLC, Omies Oasis, Inc., and Bilal Akhtar. These individuals and entities are not parties to this appeal.

(2) the trial court erroneously denied the special appearances because Mi Gwang and Clearlab did not have the requisite minimum contacts with Texas for the trial court to exert personal jurisdiction over them; and (3) the exercise of jurisdiction over Mi Gwang and Clearlab offends traditional notions of fair play and substantial justice.

## II. STANDARD OF REVIEW

Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law. *Moncrief Oil Int'l Inc. v. OAO Gazprom Exp., LLC*, 414 S.W.3d 142, 150 (Tex. 2013); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 SW.3d 777, 790–91 (Tex. 2005); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Because the trial court's exercise of personal jurisdiction over a nonresident defendant is one of law, an appellate court reviews the trial court's determination of a special appearance de novo. *Moncrief,* 414 S.W.3d at 150; *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *BMC Software*, 83 SW.3d at 794. However, the trial court must frequently resolve questions of fact before deciding the jurisdictional question. *BMC Software*, 83 SW.3d at 794; *Capital Tech. Info. Servs., Inc. v. Arias & Arias, Consultores*, 270 SW.3d 741, 748 (Tex. App.—Dallas 2008, pet. denied) (en banc). When a trial court does not issue findings of fact or conclusions of law, as in this case, "all facts necessary to support the judgment and supported by the evidence are implied." *BMC Software*, 83 S.W.3d at 795; *see Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). Because the appellate record includes the reporter's and clerk's records, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 795. We will

3

affirm the trial court's ruling on any legal theory that finds support in the record. *Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied).

We analyze the propriety of a special appearance on the basis of "the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a(3); *see Camac v. Dontos*, 390 S.W.3d 398, 405 (Tex. App.—Dallas 2012, no pet.). On appeal, the scope of review in a special appearance case includes all evidence in the record. *Dodd v. Savino*, 426 S.W.3d 275, 284 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Horowitz v. Berger*, 377 S.W.3d 115, 122 (Tex. App.—Houston [14th Dist.] 2012, no pet.). We do not resolve merits-based questions on appeal regarding a special appearance. *See Michiana*, 168 S.W.3d at 791–92 (stating special appearance involves consideration of only jurisdiction, not merits or liability); *Pulmosan Safety Equip. Corp. v. Lamb*, 273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (same); *Petrie v. Widby*, 194 S.W.3d 168, 175 n. 2 (Tex. App.—Dallas 2006, no pet.) ("[I]n reviewing an order denying a special appearance, we do not concern ourselves with the merits of the plaintiffs' claims.").

### III. PLEADINGS

In their first issues, Mi Gwang and Clearlab contend that the Chapas' pleadings failed to support their assertion of personal jurisdiction. They contend that the Chapas "failed to plead jurisdictional allegations that [they] committed any actionable conduct in Texas," that Mi Gwang and Clearlab filed affidavits establishing that they were non-residents of Texas, and that this was the only step that they needed to take to defeat all bases of personal jurisdiction.

4

By their third amended original petition, the Chapas alleged, in relevant part:

Defendant MI GWANG CONTACT LENS CO LTD, is a foreign limited liability company organized under the laws of South Korea, whose home office address is 116-2 Hyeopseok-Ri, Namcheon-Myeon, Gyeongsan-Si, KR-47, Republic of Korea, and whose designated United States agent for service of process is Sung June Park at Clearlab US, Inc., 4200 Jenkins Ct., Suwanee, GA 30024. At all times relevant to suit, this Defendant had continuous, systematic, and sufficient minimum contacts with Texas, its actions were directed to be committed in the State of Texas and/or had reasonably foreseeable consequences in Texas, this Defendant conspired or purposefully availed itself of the benefit, advantage, and profit of availing itself of this jurisdiction, advertised, established channels of regular communications, routine sales, contractual relationships, settlements and legal resolutions to disputes under Texas law, and the contacts of its agents, apparent agents, partners, alter egos, joint venturers, downstream distributors, or representatives should be attributed or fused to prevent injustice, fraud, or a sham. Although this Defendant engages in business in Texas and throughout the United States, and this suit arises from defendant's business in Texas, Defendant has not designated or maintained an agent for service of process as required by law. Defendant MI GWANG CONTACT LENS CO. LTD, was thus served in accordance with the Texas rules of procedure, by service of process and a copy of this pleading by certified mail, return receipt requested, upon Sung June Park at 4200 Jenkins Ct., Suwanee, GA 30024. Service was by private process server upon Sung June Park, or other manager of the company. This Defendant has appeared and answered herein, thus no additional service is necessary at this time.

. . . .

Defendant CLEARLAB US, INC., is a foreign limited liability company organized under the laws of the State of Georgia, whose home office address is 4200 Jenkins Ct, Suwanee, GA 30024. At all times relevant to suit, this Defendant had continuous, systematic, and sufficient minimum contacts with Texas, its actions were directed to be committed in the State of Texas and/or had reasonably foreseeable consequences in Texas, this Defendant conspired or purposefully availed itself of the benefit, advantage, and profit of availing itself of this jurisdiction, advertised, established channels of regular communications, routine sales, contractual relationships, settlements, and legal resolutions to disputes under Texas law, and the contacts of its agents, apparent agents, partners, alter egos, joint venturers, downstream distributors, or representatives should be attributed or fused to prevent injustice, fraud, or a sham. Although this Defendant does business in Texas, it does not maintain a regular place of business in Texas or a designated agent for service of process. Therefore,

5

Defendant CLEARLAB US, INC. was served in accordance with the Texas rules of procedure, by service of process and a copy of this pleading by certified mail, return receipt requested, to Sung June Park at 4200 Jenkins Ct., Suwanee, GA 30024. Service was by private process server upon Sung June Park, or other manager of the company. This Defendant has appeared and answered herein, thus no additional service is necessary at this time.

. . . .

Defendants Mi Gwang and ClearLab are in reality and legally the same entity and must be treated as such to prevent fraud and injustice. They are not operated as separate businesses, but are a single business enterprise, a sham, alter egos, joint venturers, agents and/or apparent agents of the other, and their identities are properly fused in fairness for all legal and jurisdictional purposes. Defendants Mi Gwang/ClearLab purposefully availed itself of the Texas forum at all times relevant to suit, and its contacts with the State of Texas are continuous and systematic. Defendants Mi Gwang/ClearLab are subject to the specific jurisdiction of this court, and their contact with this State are also sufficient to support general jurisdiction. Exercise of jurisdiction by Texas courts over Defendants Mi Gwang/ClearLab is fair and will not offend traditional notions of fairness and substantial justice, and is consistent with the policies and practices of the State of Texas (including this state's shared interstate and international interests), as well as the interests of Plaintiffs in having available a convenient and fair venue and jurisdiction for seeking relief. Defendants Mi Gwang/ClearLab put (or together caused to be put) the subject product and others like it into the stream of commerce in Texas, knew some of them (a lot of them actually) would reach the State of Texas, serviced the Texas market, directed sales at the State of Texas, marketed the product in Texas (directly and/or indirectly), used their trademarks in Texas, established channels of communication with Texas customers, contracted in Texas, marketed the product through distributors who sell the product in Texas, solicited business in Texas, marketed the product via Texas sales agents, other agents, and apparent agents (downstream sellers in this case and others).

The plaintiff and the defendant bear "shifting burdens of proof" in a challenge to personal jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Id.*; *Moncrief*, 414 S.W.3d at 149; *Kelly*, 301 S.W.3d at 658; *Moki Mac*, 221 S.W.3d at 574. When the

6

plaintiff's initial burden is met, the burden shifts to the defendant who then has the burden of negating all bases of jurisdiction alleged in the plaintiff's petition. *Moncreief*, 414 S.W.3d at 149; *Kelly*, 301 S.W.3d at 657–58; *Moki Mac*, 221 S.W.3d at 574. If the plaintiff fails to plead facts bringing the defendant within reach of the long-arm statute, the defendant need only prove that it does not live in Texas to negate jurisdiction. *Kelly*, 301 S.w3d at 658–59; *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982).

Here, the Chapas' third amended original petition expressly asserted that Mi Gwang and Clearlab failed to exercise reasonable care in the distribution and sale of cosmetic contact lenses to Victoria, thereby causing her personal injury. The Chapas stated that Mi Gwang and Clearlab "had continuous, systematic, and sufficient minimum contacts with Texas," their "actions were directed to be committed in the State of Texas and/or had reasonably foreseeable consequences in Texas," they had "conspired or purposefully availed [themselves] of the benefit, advantage, and profit of availing [themselves] of this jurisdiction," and that they had "advertised, established channels of regular communications, routine sales, contractual relationships, settlements and legal resolutions to disputes under Texas law." The Chapas asserted that Mi Gwang and Clearlab put the "subject product and others like it into the stream of commerce in Texas," knew that "a lot" of such products would reach Texas, and "serviced the Texas market, directed sales at the State of Texas, marketed the product in Texas (directly and/or indirectly), used their trademarks in Texas, established channels of communication with Texas customers, contracted in Texas, marketed the product through distributors who sell the product in Texas, solicited business in Texas, and marketed the product via Texas

sales agents, other agents, and apparent agents (downstream sellers in this case and others)."[2]

"The Texas long-arm statute's broad doing-business language 'allows the statute to reach as far as the federal constitutional requirements of due process will allow.'" *Retamco*, 278 S.W.3d at 337 (quoting *Moki Mac*, 221 S.W.3d at 575); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West Westlaw through 2013 3d C.S.); *see also Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). Under this standard, the Chapas met their burden to plead sufficient allegations to bring Mi Gwang and Clearlab within the provisions of the Texas long-arm statute. Accordingly, we overrule Mi Gwang and Clearlab's first issues.

## IV. JURISDICTION

In their second issues, Mi Gwang and Clearlab assert that they lack the minimum contacts with Texas for the trial court to exercise jurisdiction over them. Texas courts may exercise personal jurisdiction over a nonresident if: (1) the Texas long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Moncrief*, 414 S.W.3d at 149; *Moki Mac*, 221 S.W.3d at 574; *see Retamco*, 278 S.W.3d at 337; *accord Schlobohm v. Shapiro*, 784 S.W.2d 355, 356 (Tex. 1990). The Texas long-arm statute provides:

> In addition to other acts that may constitute doing business, a nonresident
> does business in this state if the nonresident:

---

[2] We further note that the Chapas expounded on their jurisdictional allegations against Mi Gwang and Clearlab in their combined response to the special appearances. The trial court may properly consider additional allegations contained in a response to a special appearance. *See, e.g.*, *Alliance Royalties, LLC v. Boothe*, 329 S.W.3d 117, 120–21 (Tex. App.—Dallas 2010, no pet.); *Ennis v. Loiseau*, 164 S.W.3d 698, 705 (Tex. App.—Austin 2005, no pet); *see also Accelerated Wealth, LLC v. Lead Generation & Mktg., LLC*, No. 04-12-00647-CV, 2013 WL 1148923, at *2 (Tex. App.—San Antonio Mar. 20, 2013, no pet.) (mem. op.).

8

> (1)    contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;
>
> (2)    commits a tort in whole or in part in this state; or
>
> (2)    recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

TEX. CIV. PRAC. & REM. CODE ANN. § 17.042. The Texas long-arm statute extends Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 166 (Tex. 2007) (quoting *U—Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). "Asserting personal jurisdiction comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction complies with traditional notions of fair play and substantial justice." *Moncrief*, 414 S.W.3d at 150; *accord Retamco*, 278 S.W.3d at 338; *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). A defendant establishes minimum contacts with a forum when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Moncrief*, 414 S.W.3d at 150.

A nonresident's contacts can give rise to general or specific personal jurisdiction. *Id.*; *Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010). General jurisdiction exists when the nonresident's contacts with the state are continuous and systematic. *Moncrief*, 414 S.W.3d at 150; *Retamco*, 278 S.W.3d at 338–39. In contrast, specific jurisdiction exists when the cause of action arises from or is related to the nonresident's purposeful activities in the state. *Moncrief*, 414 S.W.3d at 150.

## A. GENERAL JURISDICTION

If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts. *Moki Mac*, 221 S.W.3d at 575; *BMC Software*, 83 S.W.3d at 796. General jurisdiction is "dispute-blind," as it permits the court to "exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state." *PHC–Minden*, 235 S.W.3d at 168; *see Nat'l Fire Ins. Co. of Hartford v. CE Design, Ltd.*, 429 S.W.3d 806, 812 (Tex. App.—Dallas 2014, no pet.). Thus, general jurisdiction involves a "more demanding minimum contacts analysis" than is involved in specific jurisdiction and has a "substantially higher" threshold. *PHC–Minden*, 235 S.W.3d at 168; *see CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996). Typically, the defendant must be engaged in longstanding business in the forum state, such as marketing, shipping products, performing services, or maintaining one or more offices there, and activities that are less extensive than that will not qualify for general jurisdiction. *PHC–Minden*, 235 S.W.3d at 168.

In conducting a general-jurisdiction analysis, we are concerned with the quality rather than the quantity of the contacts. *See id.* at 169; *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 809–10 (Tex. 2002). We carefully investigate, compile, sort, and analyze all contacts to determine if together they are proof of a pattern of continuing and systematic activity that is sufficient to support general jurisdiction. *Am. Type Culture*, 83 S.W.3d at 809; *Schlobohm*, 784 S.W.2d at 359; *see Parex Res., Inc. v. ERG Res., LLC*, 427 S.W.3d 407, 417 (Tex. App.—Houston [14th Dist.] 2014, no pet.). As the United States Supreme Court recently explained, a court has general jurisdiction when the nonresident defendant's affiliations with the state in which suit is brought are so constant

10

and pervasive as to render the nonresident defendant "essentially at home in the forum [s]tate." *Daimler AG v. Bauman*, ___ U.S., ___, ___, 134 S.Ct. 746, 752 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ___ U.S. ___, ___, 131 S.Ct. 2846, 2854 (2011)). With respect to a corporation, the place of incorporation and principal place of business are paradigmatic bases for general jurisdiction." *Id.* at 760. Aside from "an exceptional case," a corporation is at home, and thus subject to general jurisdiction as consistent with due process, only in a state that is the company's formal place of incorporation or its principal place of business. *Id.* at 761 & n.19.

## B. SPECIFIC JURISDICTION

For a Texas court to properly exercise specific jurisdiction, the defendants must have made minimum contacts with Texas by purposefully availing themselves of the privilege of conducting activities here, and their liability must have arisen from or be related to those contacts. *Moki Mac*, 221 S.W.3d at 576. The "touchstone" of jurisdictional due process is "purposeful availment." *Michiana*, 168 S.W.3d at 784. The nonresident defendant must take action that is purposefully directed at the forum state. *Moki Mac*, 221 S.W.3d at 577. To determine whether the nonresident defendant purposefully directed action toward Texas, we examine the nonresident defendant's conduct indicating an intent or purpose to serve the Texas market. *Id.*

We apply a three-factor test to determine whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas. *Moncrief*, 414 S.W.3d at 151. First, we consider only the specific defendant's contacts with the forum. *Id.* In this analysis, the unilateral activity of another party or a third person is not relevant. *Id.* Second, the contacts relied upon must be purposeful rather than random, fortuitous, or

11

attenuated. *Id.* Third, the nonresident defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* In this analysis, we do not assess the quantity of the contacts, but rather their nature and quality. *Id.* "[T]he purposeful availment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could anticipate being haled into court there." *Moncrief*, 414 S.W.3d at 152; *see BMC Software*, 83 S.W.3d at 798.

To support the exercise of specific jurisdiction, the plaintiff's causes of action must arise from or relate to the nonresident defendant's forum contacts. *Moki Mac*, 221 S.W.3d at 576. This means that a substantial connection must exist between the nonresident defendant's forum contacts and the operative facts of the litigation. *Id.* at 585. The operative facts are those facts that would be the focus of the trial. *Id.* at 575; *see also Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.); *Pulmosan*, 273 S.W.3d at 839.

### C. PRODUCT SALES & ALTER EGO

The allegations in these special appearances concern jurisdiction premised on product sales into the forum and jurisdiction and further concern jurisdiction based on the relationship between Mi Gwang and Clearlab. Sellers who reach beyond one state and create continuing relationships with residents of another state are subject to the specific jurisdiction of the latter in suits arising from those activities. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 873 (Tex. 2010); *Moki Mac*, 221 S.W.3d at 575. However, a seller's knowledge that a product may end up in the forum state by itself is not sufficient to show an act purposefully directed toward the forum state. *Spir Star AG*, 310 S.W.3d at 873; *CSR*, 925 S.W.2d at 595; *see also Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal.*,

12

480 U.S. 102, 112 (1987) (plurality op.). Instead, the seller must display some "additional conduct" beyond merely placing the product in the stream of commerce that indicates an intent or purpose to serve the market in the forum state. *Spir Star AG*, 310 S.W.3d at 873; *see Moki Mac*, 221 S.W.3d at 577; *Michiana*, 168 S.W.3d at 786; *see also Asahi*, 480 U.S. at 112. Examples of this additional conduct include: (1) designing the product for the market in the forum state; (2) advertising in the forum state; (3) establishing channels for providing regular communication with customers in the forum state; and (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum state. *Spir Star* AG, 310 S.W.3d at 873; *Moki Mac*, 221 S.W.3d at 577; *Michiana*, 168 S.W.3d at 786; *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985); *see also Asahi*, 480 U.S. at 112.

"When an out-of-state manufacturer . . . specifically targets Texas as a market for its products, that manufacturer is subject to a product liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas distributor or affiliate." *Spir Star*, 310 S.W.3d at 874–75 (citing *Asahi*, 480 U.S. at 112). In such cases, it is not the actions of the Texas intermediary that count, but the actions of the foreign manufacturer who markets and distributes the product to profit from the Texas economy. *See, e.g., S.P.A. Giacomini v. Lamping*, 42 S.W.3d 265, 273 (Tex. App.—Corpus Christi 2001, no pet.) ("Giacomini ships mass quantities of its products to a distributor in Texas, fully aware that the distributor will be marketing significant quantities to customers in Texas.").

A trial court may have personal jurisdiction over a nonresident defendant if the relationship between the foreign corporation and its subsidiary that does business in

Texas is one that would allow the court to impute the subsidiary's "doing business" in Texas to the parent corporation. *BMC Software*, 83 S.W.3d at 798. This is permissible when "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *Id.* (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir.1983)). Imputing a related entity's contacts for jurisdictional purposes requires a showing that the parent controls the subsidiary's internal operations and affairs. *PHC–Minden*, 235 S.W.3d at 174, 175; *BMC Software*, 83 S.W.3d at 799. The parent's degree of control must be more than is typical with common ownership and directorship. *See PHC–Minden*, 235 S.W.3d at 176; *BMC Software*, 83 S.W.3d at 799. Examples of typical or "appropriate" parental involvement include monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies. *See PHC–Minden*, 235 S.W.3d at 176. In contrast, the type of parental control that confers jurisdiction is evidenced by the "plus" factor: "something beyond the subsidiary's mere presence within the bosom of the corporate family." *Id.* The plaintiff has the burden of proving this "plus" factor. *Id.* at 173; *Ahrens & DeAngeli, P.L.L.C. v. Flinn*, 318 S.W.3d 474, 479 (Tex. App.—Dallas 2010, pet. denied).

## D. ANALYSIS

As an initial matter, we note that several hundred pages of documents, including deposition transcripts, distribution agreements, and invoices, were designated by the parties as confidential and filed under seal. Our opinions are a matter of public record, even when designated as memorandum opinions pursuant to Rule 47.4 of the Texas

14

Rules of Appellate Procedure. *See* TEX. GOV'T CODE ANN. § 552.022(a)(12) (West, Westlaw through 2013 3d C.S.) (stating that "final opinions, including concurring and dissenting opinions, and orders issued in the adjudication of cases" are "public information"); TEX. R. CIV. P. 76a.1 ("No court order or opinion issued in the adjudication of a case may be sealed."); *see also* TEX. R. APP. P. 47.4. This is because "[w]hat transpires in the courtroom is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947). The right to public access promotes the trustworthiness of the judicial process, curbs any propensity for abuse of the judicial process, and provides the public with a more complete understanding of the judicial system. *See United States v. Holy Land Found. for Relief and Dev.*, 624 F.3d 685, 690 (5th Cir. 2010).

Some of the facts that are necessary to analyze the issues presented by this appeal are included only in the portions of the record that are designated as confidential. We have made every effort to preserve the confidentiality of the information in the sealed record; however, we cannot decide this appeal without mention of some key jurisdictional facts from the sealed record. *See MasterGuard L.P. v. Eco Techs. Int'l LLC*, 441 S.W.3d 367, 371 (Tex. App.—Dallas 2013, no pet.). Accordingly, we have attempted to strike a fair balance between the parties' interests in keeping the sealed portions of the record confidential and our responsibilities to the public as an appellate court. *See R.V.K. v. L.L.K.*, 103 S.W.3d 612, 614–15 (Tex. App.—San Antonio 2003, no pet.) (attempting to "strike a fair balance" between the parties' interest in keeping sealed portion of record confidential with interest of court and public in fulfilling responsibilities as court of record); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 456 n.1 (Tex. App.—Austin 2004, pet. denied) (explaining that because technological and proprietary

15

information at issue was filed under seal, court's references "are deliberately vague to preserve confidentiality"). Our analysis proceeds accordingly, and some of our factual recitations are generalized in order to protect the confidentiality of the materials filed under seal. *See Trilogy Software, Inc.*, 143 S.W.3d at 456 n.1.

The special appearances of both Mi Gwang and Clearlab are supported by affidavits provided by Sung June Park. Sung June stated that he is the agent for service of process for Mi Gwang and is "the Operations Manager/Deputy Management Representative" for Clearlab. Sung June is the highest ranking employee at Clearlab. In his deposition, Sung June testified that he was answering questions on behalf of both Mi Gwang and Clearlab. Mi Gwang is wholly owned by Sung June's father, Jong Gu Park. According to some evidence in the record, Clearlab is a wholly owned subsidiary of Mi Gwang, but according to other evidence, Clearlab is wholly owned by Jong Gu Park. Jong Gu Park is the chief executive officer of both Mi Gwang and Clearlab.

According to Sung June, Mi Gwang is a foreign limited liability company organized under the laws of South Korea with its principal place of business in the Republic of Korea. Clearlab is a foreign limited liability company organized under the laws of the state of Georgia with its principal place of business in Suwanee, Georgia. Sung June testified that Mi Gwang and Clearlab have "not engaged in business in Texas and did not commit any conduct alleged by the Plaintiffs in the Petition, in whole or in part, within the State of Texas." According to Sung June, Mi Gwang and Clearlab have not maintained and do not maintain places of business in Texas, and have no employees, servants or agents within Texas. Mi Gwang and Clearlab have never been residents of Texas. Mi Gwang and Clearlab have never been sued in Texas, "until this case," or filed suit in Texas. Mi

16

Gwang and Clearlab do not own, lease, rent or control any real or personal property in Texas.

According to the record evidence, Mi Gwang is a Korean manufacturer of colored cosmetic contact lenses. Clearlab imports, distributes, and sells the lenses manufactured by Mi Gwang. Mi Gwang's "company profile" states that it exports products to Clearlab in the United States and that it is an "overseas supplier" which "exports goods to importers" in, specifically, Texas and Illinois. In addition to importing its contacts to Clearlab, Mi Gwang also supplies its contacts to other distributors in the United States, such as Trinity Enterprise, Inc. ("Trinity"), located in Illinois, which then sell Mi Gwang's contacts directly to Texas distributors and retailers. Sunny Song, testifying on behalf of Trinity, stated that his sales people sold Mi Gwang's contact lenses in Texas. For instance, the record includes numerous invoices evidencing sales of Mi Gwang contact lenses from Trinity to Beauty Max in Corpus Christi, Texas, which in turn sold the contact lenses to Texas customers. The record also includes several releases for personal injuries caused by contact lenses, signed by Texas residents with Trinity "in favor of the manufacturer" of the lenses, Mi Gwang. In discussing the releases, Song stated that he had settled the personal injury claims of several Texas residents and that Mi Gwang reimbursed him for those settlements.

Linda Kim, who appeared by deposition on behalf of A-1 Marketing in Dallas, Texas, testified that she purchased contact lenses from Trinity for redistribution in Texas. When she stopped acquiring Mi Gwang's contact lenses from Trinity, she purchased them directly from Clearlab. She testified that a representative from Clearlab visited her in Texas to discuss increasing her sales of Mi Gwang's contacts.

17

Clearlab's responses to interrogatories stated that Precision Optical Products, L.L.C. is a distributor of a variety of colored lenses manufactured by different contact lens companies, including Mi Gwang, and asserts that Clearlab acts "merely as an intermediary" through which Precision imports "Bella" brand colored lenses from Mi Gwang. Clearlab asserted that it has sold contact lenses for resale to Precision Optical Products in Georgia and A-Marketing Inc. in Dallas. However, other evidence in the record indicates that Clearlab sells Mi Gwang's contacts to multiple distributers, such as A-1 Marketing in Dallas, Texas, which distributes products into Texas and also sells directly to other Texas customers. As will be discussed more fully below, for instance, Clearlab had an exclusive distributorship agreement with Mi Gwang. Moreover, the record contains multitudes of invoices and receipts documenting sales of Mi Gwang contacts from Clearlab to dozens of Texas distributors and retailers. Sung June testified that Clearlab has never actively marketed its products in Texas, but further testified that "[a]ll of our customers from Texas call in response to advertisements placed [in] trade magazines" such as "Contact Lens Spectrum" and "Optometric Management" which are distributed in Texas. According to an employment website, an employee of Clearlab stated that he was a member of a four person team who "create[d] a foundation and sales strategy to enter the US market." The employee stated that he traveled "with contact lens distributers in Texas and California to open new accounts and opportunities for the specialty lenses" and "[c]reated over 150 new accounts during the launch period." The record indicates substantial sales, with concomitant profit, of contact lenses manufactured by Mi Gwang and distributed by Clearlab to the Texas market.

18

Sung June provided additional testimony regarding Clearlab's operations. As operations manager for Clearlab, he testified that "[m]y official title is operations manager and I answer to my parents," who are the corporate officers for Clearlab. Sung June testified that his father owns the property where Clearlab is located, and Clearlab pays his father $5,000 monthly for rent. Sung June signed a distribution agreement with his father by which Clearlab agreed to act as Mi Gwang's distributor in America. In executing the distribution agreement on behalf of Clearlab, Sung June did not consult with his own attorney. The distribution agreement provides that Clearlab has a hundred thousand dollar credit maximum for purchase from Mi Gwang; however, Sung June testified that Mi Gwang had not enforced that credit limit. Sung June testified that Clearlab can only purchase and distribute contacts from Mi Gwang and Clearlab Singapore, a separate company wholly owned by Mi Gwang. Sung June testified that he must consult with his father when he is making decisions for Clearlab. Sung June testified that he did not consider Clearlab to be an extension of Mi Gwang because "[i]n a lot of respects we operate independently." Nevertheless, when queried regarding why the same law firm was representing both Mi Gwang and Clearlab, Sung June stated that his father instructed him that Clearlab should indemnify Mi Gwang.

Sung June testified that when Clearlab purchases contacts from Mi Gwang, there is "no set term," and "[a]s of late, we have been postponing payments on shipments." Sung June testified that Clearlab had been postponing payments to Mi Gwang for approximately a "year and a half." Sung June estimated that Clearlab had ordered products costing roughly a million dollars from Mi Gwang. Sung June testified that Clearlab had also been postponing payment to Clearlab Singapore for products

purchased from that entity. Sung June testified that in the past year and a half, Clearlab has received two and a half million dollars in inventory from Mi Gwang and Clearlab Singapore. Sung June testified that he planned to repay his father for the $2.5 million of contact lenses "[a]s soon as we start turning a profit." Sung June testified that he would make the determination as to when Clearlab had made enough profit to pay Mi Gwang, but that he would have to consult with his father regarding that decision.

In our analysis of Mi Gwang and Clearlab's first issues, we determined that the Chapas upheld their initial burden to plead sufficient allegations to bring Mi Gwang and Clearlab within the provisions of the Texas long-arm statute. *Moncrief*, 414 S.W.3d at 149; *Kelly*, 301 S.W.3d at 658; *Moki Mac*, 221 S.W.3d at 574. We further conclude that Mi Gwang and Clearlab have failed to meet their burden of negating all bases of jurisdiction alleged in the Chapas' petition. *Moncreief*, 414 S.W.3d at 149; *Kelly*, 301 S.W.3d at 657–58; *Moki Mac*, 221 S.W.3d at 574. The evidence before the trial court indicates that Mi Gwang and Clearlab purposefully availed themselves of the privilege of conducting activities in Texas and their liability arises from or is related to those contacts. Mi Gwang's company profile indicates that it targets Texas as one of two states where it imports its contact lenses and that its distribution stream is purposefully directed to Texas. Further, Mi Gwang controls Clearlab's internal operations and affairs more than is typical with parent-subsidiary relationships involving common ownership and directorship, and thus the contacts of Mi Gwang and Clearlab are "fused" for jurisdictional purposes. *See PHC–Minden*, 235 S.W.3d at 176; *BMC Software*, 83 S.W.3d at 799. Specifically, for instance, Sung June did not consult an attorney on behalf of Clearlab when he signed the distribution agreement with Mi Gwang, Clearlab has far exceeded the credit limit specified

20

in its distribution agreement with Mi Gwang, and Clearlab has not paid Mi Gwang for the contact lenses it has received from Mi Gwang for approximately a year and a half. These are atypical business transactions. Further, Sung June testified that he would have to consult with his father with regard to any decisions regarding Clearlab's growth or change and whether or when Clearlab should pay Mi Gwang for the contact lenses. Moreover, Sung June testified that his father instructed him that Clearlab would indemnify Mi Gwang. This degree of control is greater than that normally associated with common ownership and directorship. *See PHC–Minden*, 235 S.W.3d at 176; *BMC Software*, 83 S.W.3d at 799.

Clearlab itself sells Mi Gwang's contacts to distributors, including Texas distributors, which in turn sell the contacts for retail distribution in Texas. Clearlab has engaged in market-specific efforts, targeting Texas, to increase its sales. *Spir Star AG*, 310 S.W.3d at 873; *Moki Mac*, 221 S.W.3d at 575. Clearlab has advertised its products in Texas and has visited its Texas distributors for the purposes of increasing sales. It is undisputed that Clearlab placed the contacts into the stream of commerce where they eventually arrived in Texas and allegedly caused the Chapas' injuries.

We conclude that Mi Gwang and Clearlab's contacts with Texas were neither random nor fortuitous. Moreover, we find that there is sufficient "additional conduct" to show that they have purposefully availed themselves of the Texas market and that the exercise of personal jurisdiction in Texas courts is therefore appropriate. We overrule Mi Gwang and Clearlab's second issue.

### V. FAIR PLAY AND SUBSTANTIAL JUSTICE

21

In their third issues, Mi Gwang and Clearlab assert that the exercise of jurisdiction over them does not comport with fair play and substantial justice. In addition to sufficient minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Retamco*, 278 S.W.3d at 338. A court considers whether the exercise of jurisdiction offends traditional notions of fair play and substantial justice only if minimum contacts are established. *See Peredo v. M. Holland Co.*, 310 S.W.3d 468, 476 (Tex. App.—Houston [14th Dist.] 2010, no pet.). If a nonresident has minimum contacts with the state, then the exercise of jurisdiction over the nonresident will rarely offend traditional notions of fair play and substantial justice. *Moncrief*, 414 S.W.3d at 154–55; *Retamco*, 278 S.W.3d at 338. In evaluating this component of personal jurisdiction, we consider the following factors: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the international or interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states or nations in furthering fundamental substantive social policies. *Moncrief*, 414 S.W.3d at 150; *Guardian Royal*, 815 S.W.2d at 232. The defendant must present "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Spir Star AG*, 310 S.W.3d at 879; *Dodd*, 426 S.W.3d at 287.

Sung June testified that the burden on Mi Gwang and Clearlab of having to defend themselves in Texas would be "significant." With respect to Mi Gwang, Sung June testified that "[t]his burden will be magnified by virtue of the fact that all of its employees reside in The Republic of Korea and none of its employees reside in or have conducted

22

any work in Texas." With respect to Clearlab, Sung June testified that "[t]his burden will be magnified by virtue of the fact that all of its employees, "excluding outside sales representatives," reside in Georgia, and none of its employees reside in or have conducted any work in Texas. In contrast, the Chapas contend, essentially, that Mi Gwang and Clearlab's burden to litigate this matter in Texas is the same burden that Mi Gwang and Clearlab incur in selling contact lenses in Texas. The Chapas further assert that Texas is the most convenient forum for the litigation given the number of Texas residents and companies involved and because the tort causing injury to Victoria occurred in Texas.

Asserting personal jurisdiction over Mi Gwang and Clearlab would not offend traditional notions of fair play and substantial justice. Here, the only burden shown by either defendant is their distance from Texas. Although subjecting Mi Gwang and Clearlab to suit in Texas certainly imposes a burden on them, the same can be said of all nonresidents. However, "[d]istance alone cannot ordinarily defeat jurisdiction." *Moncrief*, 414 S.W.3d at 155; *see also Guardian Royal*, 815 S.W.2d at 231 ("[M]odern transportation and communication have made it much less burdensome for a party sued to defend himself in a [s]tate where he engages in economic activity.") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). Texas has a significant interest in adjudicating this suit because Mi Gwang and Clearlab manufacture and distribute products that are sold in Texas. Further, because the Chapas' claims against the other defendants, which arise out of the same facts as its claims against Mi Gwang and Clearlab, will be heard in Texas, it is more efficient to adjudicate the entire case in the same place. *See Spir Star*, 310 S.W.3d at 879. Also, the fact that the Chapas have

23

alleged that the Mi Gwang and Clearlab have committed a tort in whole or in part in Texas implicates a state interest in adjudicating this dispute. *See Moncrief*, 414 S.W.3d at 155; *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) ("A state has an especial interest in exercising jurisdiction over those who commit torts within its territory."). Finally, because the parties have already conducted extensive discovery in this case and the trial court is familiar with the case, it promotes judicial economy to litigate the Chapas' claims in Texas. *See Moncrief*, 414 S.W.3d at 155. On balance, asserting personal jurisdiction over Mi Gwang and Clearlab would not offend traditional notions of fair play and substantial justice. We overrule appellants' third issues.

## VI. CONCLUSION

Having overruled each of Mi Gwang and Clearlab's issues, we lift the stay previously imposed in this cause, and we affirm the trial court's order denying their special appearances.

**/s/ Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
11th day of June, 2015.

24